2012 CO 12

**COLORADO ETHICS WATCH, Petitioner,**

v.

**SENATE MAJORITY FUND, LLC; Colorado Leadership Fund, LLC; and the Office of the Administrative Courts, Respondents.**

No. 10SC276.

Supreme Court of Colorado, En Banc.

Feb. 21, 2012.

Luis Toro, Chantell Taylor, Denver, Colorado, Attorneys for Petitioner Colorado Ethics Watch.

Hackstaff Law Group, LLC, Steven A. Klenda, Mario D. Nicolais, II, Denver, Colorado, Attorneys for Respondent Senate Majority Fund, LLC.

Brownstein Hyatt Farber Schreck, LLP, Jason R. Dunn, Denver, Colorado, Attorneys for Respondents Colorado Leadership Fund.

Heizer Paul Grueskin LLP, Martha M. Tierney, Denver, Colorado, Attorneys for Amicus Curiae Colorado Common Cause.

Heizer Paul Grueskin LLP, Mark G. Grueskin, Denver, Colorado, Attorneys for Amicus Curiae Colorado Education Association.

Holland & Hart LLP, J. Lee Gray, Greenwood Village, Colorado, Attorneys for Amicus Curiae Colorado Bar Association.

Patton Boggs LLP, Kathryn E. Biber, Denver, Colorado, Attorneys for Amicus Curiae The Center for Competitive Politics.

No appearance by or on behalf of the Office of the Administrative Courts.

Chief Justice BENDER delivered the Opinion of the Court.

¶ 1 In this appeal, we review the court of appeals opinion in *Colorado Ethics Watch v. Senate Majority Fund, LLC*, —— P.3d ——, 2010 WL 963199 (Colo.App.2010). The court of appeals below affirmed the dismissal of the present action by the administrative law judge (ALJ) for failing to state a claim upon which relief could be granted. At issue is the meaning of "expressly advocating the election or defeat of a candidate," as that phrase is used within the definition of "expenditure" in article XXVIII of the Colorado Constitution, the Campaign and Political Finance provision. Colo. Const. art. XXVIII, § 2(8).

¶ 2 The appellees, the Senate Majority Fund (SMF) and the Colorado Leadership Fund (CLF), contend that "express advocacy" encompasses only those advertisements that explicitly exhort the viewer, listener, or reader to vote for or against a candidate in an upcoming election. This includes the use of so-called "magic words," as set forth in *Buckley v. Valeo*, 424 U.S. 1, 44 n. 52, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), as well as substantially similar synonyms of the "magic words."

¶ 3 Conversely, the appellant, Colorado Ethics Watch ("Ethics Watch"), argues that the category of advertisements that "expressly advocate" is more expansive and encompasses any advertisement that is the functional equivalent of "express advocacy."

According to Ethics Watch, the functional equivalent of "express advocacy" is any advertisement that has no reasonable interpretation other than that it supports or opposes a candidate's election.

¶ 4 The court of appeals rejected Ethics Watch's argument and held that, given the settled definition of "express advocacy" at the time that article XXVIII of the Colorado Constitution was adopted, the category of advertisements that constitute "express advocacy" was intentionally limited to include only those ads that use the "magic words" or substantially similar synonyms that explicitly advocate for the election or defeat of a candidate. *Colorado Ethics Watch,* —— P.3d at ——. Additionally, the court of appeals reasoned that it could not adopt a functional equivalence test because this would potentially implicate the vagueness and overbreadth concerns addressed by the Supreme Court in *Buckley* and thus result in an interpretation that violates the First Amendment. *Id.* at ——.

¶ 5 After reviewing article XXVIII and the legal context in which it was adopted as a citizen's initiative in 2002 (known as Amendment 27), we agree with the court of appeals that "expenditure" was intentionally and narrowly defined in article XXVIII to include only "express advocacy," so that it covers only those communications that explicitly advocate for the election or defeat of a candidate in an upcoming election. Given the settled legal definition of "express advocacy" in Colorado at the time that Amendment 27 was passed, we interpret this phrase consistent with Colorado jurisprudence to cover only those advertisements that use the "magic words" or substantially similar synonyms.

¶ 6 Hence, we affirm and remand to the court of appeals to return this case to the ALJ to enter judgment consistent with this opinion.

## I. Factual Background

¶ 7 During the November 2008 election season, both SMF and CLF were registered with the I.R.S. as so-called "527" tax-exempt political organizations. 26 U.S.C. § 527(e)(1) (2011). SMF's stated purpose was "supporting candidates for the state senate." CLF's stated purpose was "electing Republicans." Both SMF and CLF concede that they were "political organizations" as defined in section 1–45–103(14.5), C.R.S. (2011), and thus they registered with the secretary of state and filed regular reports detailing their contributions and spending pursuant to section 1–45–108.5.[1]

¶ 8 In contrast, however, neither SMF nor CLF complied with the special rules governing "political committees," including the registration requirement, *see* Colo. Const. art. XXVIII, § 8, and the restriction on political committees that they may not accept contributions of more than $500 per person or organizational donor, *id.* § 3(5). Specifically, neither SMF nor CLF registered as a political committee and each accepted numerous corporate contributions that far exceeded the $500 contribution limit applicable to political committees.

---

1. Section 1–45–103(14.5) defines "political organization" as any organization that is registered with the I.R.S. as a 527 and that is engaged in influencing or attempting to influence the election of a candidate for state or local office. Under section 1–45–108.5, a "political organization" must register with the secretary of state and disclose all contributions, including the donor name, donor address, and amount contributed for contributions of $20 or more and the donor's occupation and employer for contributions of $100 or more. A political organization is not, however, limited in how much it may receive or spend.

If a political organization engages in so-called "electioneering communications" totaling more than $1000 in a calendar year, then it is subject to further disclosure requirements. *See* Colo.

Const. art. XXVIII, § 6(1). An "electioneering communication" is defined as a communication that: (1) is broadcast on radio or television or printed in a newspaper, on a billboard, in a direct mailer, or in a hand-delivered flyer; (2) is distributed within thirty days of a primary or sixty days of a general election; (3) unambiguously refers to any candidate for public office; and (4) is directed at members of the electorate for such public office.

In the present consolidated action, Ethics Watch does not allege that either SMF or CLF violated the registration or disclosure requirements applicable to political organizations or the disclosure requirements applicable to political organizations that engage in electioneering communications.

¶9 In the run-up to the November 2008 election, SMF distributed eight printed political ads and one television ad and CLF distributed eight printed ads that are the subject of the present dispute. It is stipulated that the production and distribution of each of these ads cost more than $200 and that each shared the following six characteristics:

1. The ads identify a candidate by name and picture;

2. The ads identify the office for which the candidate is running;

3. The ads summarize the qualifications of the candidate;

4. The ads summarize some of the key issues the candidate supports or opposes;

5. The ads summarize what the candidate will do if elected;

6. The ads invite the voter to contact and thank the candidate for his or her efforts.

None of the seventeen ads contained words or phrases that specifically directed the viewer to "vote for," "elect," "support," "cast your ballot for [candidate]," "vote against," "defeat," or "reject." Similarly, none of the ads included the phrase "[candidate] for [office]." The closest any ad came to explicitly advocating for or against the election of a candidate was an SMF ad that included the phrase "Local Leaders *endorse* Dave Kerber." (Emphasis added.) These seventeen ads are the basis of the present dispute.

¶10 Ethics Watch filed civil complaints against SMF and CLF with the secretary of state, alleging that these advertisements violated article XXVIII of the Colorado Constitution.[2] The secretary of state referred the matter to an ALJ for an administrative hearing.[3]

¶11 In the consolidated claims before the ALJ, Ethics Watch argued that these ads constituted "express advocacy" for or against the election of the candidates they depicted and thus amounted to "expenditures" of more than $200. Ethics Watch claimed that this elevated the status of SMF and CLF to "political committees." Thus, Ethics Watch argued, SMF and CLF violated article XXVIII by failing to register as "political committees" and by failing to adhere to the contribution limit of $500 per person or organization that applies to "political committees."

¶12 SMF and CLF denied all of Ethics Watch's allegations and moved to dismiss the complaint for failure to state a claim upon which relief could be granted, pursuant to C.R.C.P. 12(b)(5).[4] SMF and CLF moved for dismissal on the grounds that neither was a "political committee" because none of the ads amounted to "express advocacy" and therefore none of the ads met the legal definition of "expenditures." Consequently, SMF and CLF argued, they were not subject to regulation as "political committees."

¶13 In a written order, the ALJ agreed with SMF and CLF that neither group met the definition of "political committee" because neither had made an "expenditure" during the election cycle. The ALJ reasoned that none of the ads constituted "express advocacy" because none of them contained either "magic words" or substantially similar synonyms that amounted to an exhortation to vote for or against a particular candidate. Accordingly, the ALJ ruled that neither SMF nor CLF was a "political committee" and dismissed Ethics Watch's complaint for failure to state a claim upon which relief could be granted.

¶14 Ethics Watch appealed the dismissal, and the court of appeals affirmed. The court of appeals similarly rejected the notion that "express advocacy" means anything more than the "magic words" listed in *Buckley*, 424 U.S. at 44 n. 52, 96 S.Ct. 612, or other

---

2. In Colorado, the enforcement of campaign finance laws is left primarily to private parties. *See* Colo. Const. art. XXVII, § 9(2)(a).

3. Once a private party files a complaint alleging a campaign finance violation to the secretary of state, the secretary of state must refer the matter to an ALJ for an administrative hearing. Colo. Const. art. XXVII, § 9(2)(a).

4. Under article XXVIII of the Colorado Constitution, the administrative hearing for alleged campaign finance violations is to be conducted in accordance with the Administrative Procedure Act, § 24-4-105, C.R.S. (2011). In turn, the Administrative Procedure Act adopts the C.R.C.P., including C.R.C.P. 12, to the greatest extent practicable. § 24-4-105(4).

substantially similar synonyms as explained in *League of Women Voters v. Davidson*, 23 P.3d 1266, 1277 (Colo.App.2001). The court of appeals rejected the functional equivalence test that Ethics Watch urged it to adopt on the grounds that "express advocacy" had a clear and settled definition at the time that the Colorado Constitution was amended to include article XXVIII.

¶ 15 Ethics Watch petitioned this court for certiorari review, which we granted.[5]

## II. Standard of Review

¶ 16 We review a dismissal for failure to state a claim under C.R.C.P. 12(b)(5) de novo and apply the same standards as the trial court. *Bly v. Story*, 241 P.3d 529, 533 (Colo.2010). Accordingly, we accept all allegations in the complaint as true and view them in the light most favorable to the non-moving party. *Id.* Dismissal under C.R.C.P. 12(b)(5) is only proper where the factual allegations in the complaint cannot, as a matter of law, support the claim for relief. *Rosenthal v. Dean Witter Reynolds, Inc.*, 908 P.2d 1095, 1099 (Colo.1995). Motions to dismiss for failure to state a claim are disfavored and should not be granted if relief is available under any theory of law. *Dorman v. Petrol Aspen, Inc.*, 914 P.2d 909, 911 (Colo. 1996).

## III. Article XXVIII of the Colorado Constitution

¶ 17 The primary campaign finance law in Colorado is article XXVIII of the Colorado Constitution, which was proposed by citizen's initiative as Amendment 27 and adopted by popular vote in 2002. As the preamble to Amendment 27 states, it was passed in an effort to mitigate the fact that "large campaign contributions to political candidates create the potential for corruption and the appearance of corruption." Colo. Const. art. XXVIII, § 1. Section 1 explicitly states that the purpose of article XXVIII is to limit the disproportionate influence that wealthy individuals, corporations, and special interest

groups can have over the electoral process because "the interests of the public are best served by [such regulation]." *Id.* To that end, article XXVIII encourages voluntary spending limits and imposes reporting requirements, disclosure rules, and contribution limits on certain entities, including "political committees." *Id.* §§ 3–5, 7. Article XXVIII vests the secretary of state with the authority both to promulgate regulations to facilitate the enforcement of the amendment and to levy substantial civil penalties against violators. *Id.* §§ 9, 10.

¶ 18 Pertinent to this case, under article XXVIII, so-called "political committees" must register with the secretary of state and may not receive contributions in excess of $500 from any individual or organization. *Id.* § 3(5). Under section 2(12) of article XXVIII, a "political committee" is defined as an "[organization] or any group of two or more persons ... that have accepted or made ... *expenditures* in excess of $200 to support or oppose the nomination or election of one or more candidates." (Emphasis added.) Section 2(8), defines "expenditure" as "any purchase, payment, distribution, loan, advance, deposit, or gift of money by any person for the purpose of *expressly advocating the election or defeat of a candidate.*" (Emphasis added.)

¶ 19 In this case, whether SMF and CLF violated article XXVIII by failing to comply with the restrictions governing "political committees" turns solely on whether any of the nine SMF ads at issue and/or any of the eight CLF ads at issue constituted "express advocacy," as that term is used in section 2(8) of our constitution.

## IV. "Express Advocacy"

¶ 20 When interpreting a constitutional amendment adopted by citizen's initiative, we "give effect to the electorate's intent in enacting the amendment." *Davidson v. Sandstrom*, 83 P.3d 648, 654 (Colo.2004). To determine what the voters intended, we "give

---

5. We granted certiorari review on the following issue:

Whether the court of appeals properly interpreted and applied "for the purpose of ex-

pressly advocating the election or defeat of a candidate" as it appears in the definition of "expenditure" in article XXVIII, section 2(8)(a) of the Colorado Constitution.

words their ordinary and popular meaning." *Id.* If the language of an amendment is clear and unambiguous, then it must be enforced as written. *In re Interrogatories Relating to the Great Outdoors Colorado Trust Fund,* 913 P.2d 533, 538 (Colo.1996). If, however, the language of an amendment is susceptible to multiple interpretations, then we "construe the amendment in light of the objective sought to be achieved and the mischief to be avoided by the amendment." *Zaner v. City of Brighton,* 917 P.2d 280, 283 (Colo.1996). "The electorate, as well as the legislature, must be presumed to know the existing law at the time [it] amend[s] or clarif[ies] that law." *Common Sense Alliance v. Davidson,* 995 P.2d 748, 754 (Colo.2000). Hence, to resolve this case, we determine if there was a settled definition of "express advocacy" when the voter initiative was adopted by the citizens of Colorado in 2002.

¶ 21 Within the field of campaign finance law, "express advocacy" was first defined in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659. There, the Supreme Court reviewed a challenge to the Federal Election Campaign Act of 1971 (FECA), which, among other things, limited the amount spent on independent communications made *"relative to* a clearly identifiable candidate." *Id.* at 7, 96 S.Ct. 612 (emphasis added). After first determining that contribution limits implicate a fundamental First Amendment right—political speech—the Court proceeded to hold that the limit on independent expenditures was unconstitutionally vague because it failed "to clearly mark the boundary between permissible and impermissible speech." *Id.* at 14, 41, 96 S.Ct. 612. The court reasoned that even if "relative to" was interpreted to cover only speech that could be reasonably understood as advocating for or against a candidate, the regulation was still constitutionally infirm because "the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application." *Id.* at 42, 96 S.Ct. 612. In other words, because there is often significant overlap between candidates and the issues that they champion

or oppose, the Court was concerned that independent speech related to issues could be interpreted by some to implicate a candidate and thus trigger the contribution limitation. *See id.* at 42–43, 96 S.Ct. 612. This would be unconstitutional because if speech is primarily about an issue and not a candidate, the governmental interest in preventing corruption dissolves and can no longer be used to justify the restriction on political speech. *Id.* at 47–51, 96 S.Ct. 612.

¶ 22 Accordingly, the *Buckley* Court held that the limitation on independent expenditures could only be upheld as constitutional if it were defined in the narrowest terms. *Id.* at 44, 96 S.Ct. 612. The Court held that the limitation "must be construed to apply only to expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office." *Id.* In a now famous footnote, the Court elaborated that "[t]his construction would restrict the application of [the limitation] to communications containing express words of advocacy or defeat, such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.'" [6] *Id.* at 44 n. 52, 96 S.Ct. 612. By interpreting the independent expenditure limitation as narrowly as possible and limiting its application to only those words that explicitly advocate the election or defeat of a candidate, the *Buckley* Court was thus able to uphold the statute as constitutional. *Id.* at 44–45, 96 S.Ct. 612. As a result, the use or omission of the "magic words" has come to serve as a bright line rule separating "express advocacy," which can be regulated, from "issue advocacy," which cannot be regulated. *McConnell v. FEC,* 540 U.S. 93, 126, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003), *overruled in part by Citizens United v. FEC,* —— U.S. ——, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010).

¶ 23 In the aftermath of *Buckley,* every court that has confronted this issue has interpreted footnote 52 to cover not only the "magic words," but also other synonymous words or phrases that clearly advocate for or

---

6. This list of examples used to define "express advocacy" in *Buckley* has come to be known as the "magic words." *See, e.g., FEC v. Wisconsin*

*Right to Life, Inc.,* 551 U.S. 449, 513, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007) [hereinafter "*WRTL* "].

against the election of a candidate. *See* Glenn J. Moramarco, *Magic Words and the Myth of Certainty*, 1 Election L.J. 387, 393 n. 37 (2002) (collecting cases). Generally, these courts have reasoned that the inclusion of "such as" before the list of "magic words" in footnote 52 indicates that the list was non-exhaustive and thus that the Court was merely attempting to provide guidance to lower courts in the future. *Id.* at 393.

¶ 24 Less than two years before the adoption of article XXVIII, this interpretation of footnote 52 was adopted in Colorado by a panel of the court of appeals in *League of Women Voters v. Davidson*, 23 P.3d 1266. There, on facts similar to this case, a non-profit corporation was alleged to have violated Colorado's Fair Campaign Finance Act (FCFA),[7] § 1–45–101 to –118, C.R.S. (2001), which placed registration, reporting, and disclosure requirements on "political committees," including organizations that engaged in independent expenditures "for the purpose of advocating the election or defeat of a candidate." §§ 1–45–103(7), –103(10)(a), C.R.S. (2001). The plaintiffs alleged that the nonprofit violated the FCFA through the production and distribution of eight ads, each containing the picture and issue positions of a candidate or several candidates. *League of Women Voters*, 23 P.3d at 1268–69. Although the plaintiffs conceded that none of the ads contained any of the "magic words" listed in *Buckley*, they argued that subsection 103(7) went beyond the narrow scope of *Buckley* to also cover speech that could only be interpreted to unambiguously—but not necessarily explicitly—advocate for the election or defeat of a candidate. *Id.* at 1276.

¶ 25 The *League of Women Voters* court rejected this approach on the grounds that it was too vague and too overbroad to survive the constitutional framework set forth in *Buckley. Id.* ("[A] narrow or strict interpretation of *Buckley* is appealing ... [because] it affords the greatest First Amendment pro-

tection....."). Rather than apply a strict "magic words" test, however, the court interpreted *Buckley*'s use of the phrase "such as" to preface the list of "magic words" in footnote 52 to mean that "the listed words and phrases constitute an exemplary, not exclusive, list." *Id.* at 1277. Accordingly, the court interpreted *Buckley* to permit the regulation of speech that used either the "magic words" or "substantially similar or synonymous words." *Id.* The court held that this definition of "express advocacy" was constitutional under *Buckley* because "[u]nlike the broad context-based approach, this approach remains focused on actual words, not images, symbols, or other contextual factors." *Id.* Although the court acknowledged that this test could easily be circumnavigated by speech that implies rather than explicitly advocates for the election or defeat of a candidate, it nonetheless recognized that this careful parsing is required to protect "the most cherished form of free speech, political speech." *Id.* at 1276–77. The court of appeals opinion in *League of Women Voters* was not appealed.

¶ 26 Accordingly, following *League of Women Voters*, Colorado law was clear that "express advocacy" was limited to speech that contained either *Buckley*'s "magic words" or substantially similar synonyms, which explicitly exhort the viewer or reader to vote for or against a candidate in an upcoming election. Less than twenty months later, with no intervening alterations to Colorado campaign finance law, the voters passed Amendment 27, which explicitly defined "expenditure" as a payment made "for the purpose of *expressly advocating* the election or defeat of a candidate." Colo. Const. art. XXVIII, § 2(8)(a) (emphasis added). Because we presume that the electorate was aware of the legal significance of the term "expressly advocated" when article XXVIII was adopted by voter initiative in 2002, we hold that the voters intended to define "polit-

---

7. Although the FCFA still exists in an amended form, it has now been largely supplanted by article XXVIII of the Colorado Constitution. *See* Richard B. Collins, The *Colorado Constitution in the New Century*, 78 U. Colo. L.Rev. 1265, 1270–71 (2007). For example, the definition of "independent expenditure" in section 1–45–103(11), C.R.S. (2001), at issue in *League of Women Voters* was amended following the passage of Amendment 27 in 2002, so that the term is now statutorily defined by direct reference to section 2(9) of article XXVIII. Ch. 339, sec. 1, § 1–45–103, 2003 Colo. Sess. Laws 2156–61.

ical committees" as those organizations that engage in communications that utilize either the "magic words" or substantially similar synonyms.

¶ 27 Nevertheless, Ethics Watch argues that under the plain meanings of the words "express" and "advocacy," the definition of "expenditure" in section 2(8) of article XXVII was clearly intended to cover all ads that unmistakably communicate support or opposition to a candidate. *See Black's Law Dictionary* 661 (9th ed. 2009) (defining "express" as "[c]learly and unmistakably communicated"); *id.* at 64 (defining "advocacy" as "[t]he act of pleading for or actively supporting a cause"). This interpretation of article XXVIII, however, would require us to ignore the settled definition of "express advocacy" that existed at the time that Amendment 27 was adopted by the voters.

¶ 28 Under *Common Sense Alliance,* we presume that the electorate knew the existing law when it adopted a definition of "expenditure" that was limited to those ads that "expressly advocat[e] the election or defeat of a candidate." 995 P.2d at 754; *see also City & County of Denver v. Rinker,* 148 Colo. 441, 446, 366 P.2d 548, 550 (1961) ("[T]here is a presumption that all laws are passed with knowledge of those already existing. . . ."). As explained above, in Colorado in 2002, "express advocacy" was a term of art used to define a discrete category of political speech. Accordingly, we presume that the voters chose this phrase intentionally in defining "expenditures" in an effort to balance the public concerns related to the impact of independent financing in elections and the constitutional concerns outlined in *Buckley,* which prohibit limitations on speech that are vague or overinclusive. While Ethics Watch argues that this is an overly technical reading of article XXVIII, it appears to us from decades of campaign finance jurisprudence that "express advocacy" represents a technical term with a technical definition that was correctly recognized and applied in *League of Women Voters. See, e.g., Buckley,* 424 U.S. at 44, 96 S.Ct. 612; *FEC v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 249–51, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (holding that a publication that listed pro-life candidates and

urged readers to vote for pro-life candidates constituted "express advocacy" because the publication was an "explicit directive"); *Citizens for Responsible Gov't v. Davidson,* 236 F.3d 1174, 1187 (10th Cir.2000) (explaining that "express words of advocacy [are] not simply a helpful way to identify 'express advocacy' . . . the inclusion of such words [is] constitutionally required" for campaign finance regulations to be valid under the First Amendment).

¶ 29 This interpretation is consistent with the intent of the voters as evinced by the explanation of Amendment 27 in the 2002 Bluebook. Colo. Legislative Council, Research Pub. No. 502–7, *2002 Ballot Information Booklet: Analysis of Statewide Ballot Issues 4–5* (2002) [hereinafter "Bluebook 2002"]; *see In re Interrogatories on House Bill 99–1325,* 979 P.2d 549, 554 (Colo.1999) ("[A] court may ascertain the intent of the voters by considering other relevant matters such as . . . the biennial 'Bluebook,' which is the analysis of ballot proposals prepared by the legislature."). The Bluebook distinguished between "expenditures" and "electioneering communications" by defining "expenditures" as the types of political advertisements that *specifically urge* the election or defeat of a candidate." Bluebook 2002 at 4 (emphasis original). In contrast, the Bluebook described "electioneering communications" as the "type of political advertisement . . . that clearly refers to a candidate *without specifically urging* the election or defeat of the candidate." *Id.* at 5 (emphasis original). Thus, the Bluebook distinguished between "electioneering communications," which merely refer to a candidate without advocating for his or her election or defeat, and "expenditures," which actively instruct the viewer or reader to take action for or against a candidate.

¶ 30 Ethics Watch argues in the alternative that, even if "express advocacy" had a settled technical definition in Colorado at the time that Amendment 27 was adopted, subsequent jurisprudence from the U.S. Supreme Court requires a more expansive interpretation under the First Amendment. Ethics Watch contends that both *McConnell v. FEC,* 540 U.S. 93, 124 S.Ct. 619, *overruled in part*

by *Citizens United,* —— U.S. ——, 130 S.Ct. 876, and *FEC v. WRTL,* 551 U.S. 449, 127 S.Ct. 2652, mandate that if "express advocacy" is to provide a workable standard, it must be interpreted to include advertisements that are the "functional equivalent" of express advocacy, which includes ads that are susceptible to no other reasonable interpretation than as an appeal to vote for or against a candidate.

¶ 31 We disagree with Ethics Watch's reading of these cases and decline to adopt a functional equivalence test for "express advocacy,' which we believe could potentially violate the vagueness and overbreadth concerns at the heart of *Buckley.* While it is true that these recent U.S. Supreme Court decisions have approved of something akin to a functional equivalence test, both of these decisions can be distinguished because they involved "electioneering communications," which are statutorily defined to apply in more limited circumstances than the "express advocacy" at issue in the present case.

¶ 32 In *McConnell,* the Court rejected a facial challenge to the recently enacted Bipartisan Campaign Reform Act's (BCRA) application to "electioneering communications." 540 U.S. at 196–97, 124 S.Ct. 619. The BCRA placed significant disclosure requirements on groups or persons who fund "electioneering communications," which the Act defined as any advertisement that: (1) is broadcast on radio or television; (2) clearly identifies a candidate for federal office; (3) airs within either thirty days of a primary or sixty days of a general election; and (4) targets an identified audience of at least 50,000 listeners or viewers. *Id.* at 194, 124 S.Ct. 619. Although the Court recognized that this definition applied to both express advocacy and the functional equivalent of express advocacy (that is, something beyond the "magic words"), it reasoned that because the definition of "electioneering communication" was "easily understood and objectively determinable," it could survive the "vagueness concerns that drove [its] analysis in *Buckley.*" *Id.* at 192–94, 196–97, 124 S.Ct. 619. Importantly, however, the Court recognized that speech that is the functional equivalent of express advocacy is different from

express advocacy, which is narrowly defined as speech containing the "magic words." *Id.* at 191–92, 124 S.Ct. 619.

¶ 33 In *WRTL,* the Court again interpreted the BCRA's limitations on "electioneering communications," but in this instance held that the regulation was unconstitutional as applied to three particular advertisements. 551 U.S. at 481, 127 S.Ct. 2652. There, the Court overturned the regulation of advertisements opposing Senator Feingold's efforts to filibuster the president's judicial appointments as "electioneering communications." *Id.* at 458–60, 127 S.Ct. 2652. Although the ads clearly identified Senator Feingold and were broadcast within the electioneering window to a target audience of more than 50,000 voters, the Court held that the regulation of the ads as "electioneering communications" was unconstitutional as applied because the ads could reasonably be interpreted as something other than an appeal to vote for or against Senator Feingold. *Id.* The Court held that when applied to an ad that could reasonably be interpreted as pure issue advocacy, the regulation served to unconstitutionally chill protected political speech. *Id.* at 469, 127 S.Ct. 2652.

¶ 34 Notably, the *WRTL* Court instructed that in determining whether speech could reasonably be construed as not advocating for the election or defeat of a candidate, courts must look at the words used in the ad and not the intention behind them: "[A]n intent-based test would chill core political speech." *Id.* at 468–70, 127 S.Ct. 2652. The Court feared that such a test would "open[ ] the door to a trial on every ad … on the theory that the speaker actually intended to affect an election." *Id.* at 468, 127 S.Ct. 2652. The Court reasoned that the threat of such burdensome litigation would serve as a deterrent and chill protected political speech. *Id.* at 468–70, 127 S.Ct. 2652. Accordingly, the Court narrowed the field of speech that fell under the BCRA's regulation of "electioneering communications" to only those ads that are "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *Id.* at 470, 127 S.Ct. 2652.

¶ 35 Unlike the definition of "electioneering communication" at issue in *McConnell* and *WRTL,* the definition of "expenditure" in article XXVIII of the Colorado Constitution does not expand beyond speech that falls under the definition of "express advocacy." Although both *McConnell* and *WRTL* allow for some regulation of speech that is more than just express advocacy, the Supreme Court was clear in each instance that these limitations were tolerable because of the objective and bright-line criteria used to define "electioneering communications" under the BCRA. *See WRTL,* 551 U.S. at 474 n. 7, 127 S.Ct. 2652. In other words, the Supreme Court was willing to tolerate the broader scope of speech that fit under the definition of "electioneering communication" precisely because of that regulation's more narrow application.

¶ 36 In contrast to "electioneering communications," which are narrowly defined by the timing, medium, and reach of such ads, our constitutional limitations on "political committees" that make "expenditures" apply regardless of the timing or format of any ads that cost more than $200.[8] Thus, if we were to expand our definition of "expenditure" in article XXVIII beyond a literal interpretation of "express advocacy" to also cover speech that is the functional equivalent of express advocacy, our law might violate the vagueness and overbreadth concerns from *Buckley* that are the bedrock of all campaign finance and political speech jurisprudence. *WRTL,* 551 U.S. at 474, 127 S.Ct. 2652 ("Where the First Amendment is implicated, the tie goes to the speaker, not the censor.").

¶ 37 Given the well-settled definition of "express advocacy" from *League of Women Voters* at the time Amendment 27 was adopted, we decline to make a leap that could potentially render article XXVIII unconstitutional under the federal constitution. *Accord Mesa Cnty. Bd. of Comm'rs v. State,* 203 P.3d 519, 527 (Colo.2009) (explaining that when we review a statute, we presume that the legislature intended the statute to be constitutional); *see also Bickel v. City of Boulder,* 885 P.2d 215, 229 (Colo.1994) (explaining that a citizen's initiative should not be interpreted so as to arrive at an absurd or unreasonable result). A functional equivalence test might be found to create an unwieldy standard that would be difficult to apply and, as a result, potentially serve to unconstitutionally chill protected political speech. *WRTL,* 551 U.S. at 468–69, 127 S.Ct. 2652. Therefore, we decline to adopt the expansive interpretation put forth by Ethics Watch.

## V. Application

¶ 38 Having determined the meaning of "express advocacy," we apply this definition to the facts of the case at hand. Under de novo review, we conclude that the court of appeals did not err in affirming the dismissal of Ethics Watch's complaint against SMF and CLF because none of the seventeen ads at issue contained any of the "magic words" or substantially similar synonyms that explicitly urged a vote for or against a candidate. It was stipulated by all parties that the seventeen ads at issue merely identify candidates by name and/or picture, identify the offices for which the candidates are running, identify the positions the candidates have taken on certain issues, favorably presents the candidates' positions on issues, and asks the viewers or readers to contact the candidates and thank them. As held in *League of Women Voters,* these facts are insufficient to

---

8. This is similar to the division that our state constitution makes between electioneering communications and expenditures. *Compare* Colo. Const. art. XXVIII, § 7(a) (defining "electioneering communications" broadly in the sense that it covers speech that "unambiguously refers" to any candidates but also narrowly in the sense that it only applies within the limited "electioneering" window and to speech costing more than $1000) *with id.* § 8(a) (defining "expenditures" narrowly in the sense that it only covers speech that constitutes express advocacy but broadly in the sense that it applies regardless of the timing of the speech and to speech costing more than $200).

Again, we note that SMF and CLF concede that they constituted political organizations and thus were generally bound by the disclosure requirements applicable to all political organizations and specifically bound by the disclosure requirements applicable to political organizations that engage in "electioneering communications." *See id.* § § 6. Ethics Watch does not allege that either SMF or CLF failed in its constitutional or statutory obligations as political organizations. *See supra* n. 1.

render the ads subject to regulation as "express advocacy." 23 P.3d at 1276.

¶ 39 Ethics Watch specially holds out one CLF print ad that states "Local leaders *endorse* Dave Kerber" as what it claims to be a clear violation of the "magic words" test. (Emphasis original). While we agree that in some instances, "endorse" could be a magic word, we also agree with the court of appeals that this particular phrasing is insufficient. Unlike an ad that urges the reader to "endorse" the candidate at the ballot box, the phrase in this CLF ad does not exhort the reader to vote for or against Mr. Kerber. *See Massachusetts Citizens for Life,* 479 U.S. at 249, 107 S.Ct. 616 (*"Buckley* adopted the 'express advocacy' requirement to distinguish discussion of issues and candidates from more pointed exhortations to vote for particular persons.").

¶ 40 Because none of the ads at issue amount to "expenditures" under section 2(8) of article XXVIII, we hold that it was proper for the ALJ to conclude that neither SMF nor CLF met the definition of a "political committee" under section 2(12)(a) and thus, it was proper to dismiss the present action for failing to state a claim on which relief could be granted.

## Conclusion

¶ 41 We hold that the court of appeals correctly interpreted "express advocacy" as limited to speech that explicitly advocates for the election or defeat of a candidate through the use of the "magic words" set out in *Buckley* or substantially similar synonyms. Hence, we hold that dismissal was proper and we remand to the court of appeals to return this case to the ALJ with instructions to take action consistent with this opinion.