Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us.  Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
January 22, 2018

**2018 CO 3**

**No. 16SC112, <u>Norton v. Rocky Mountain Planned Parenthood, Inc.</u>—Constitutional Law—Article V, section 50—Motion to Dismiss.**

In this case, the supreme court considers whether the petitioner's complaint alleged a violation of article V, section 50 of the Colorado Constitution sufficient to overcome a motion to dismiss.  The supreme court holds that to state a claim for relief under section 50, a complaint must allege that the State made a payment to a person or entity—whether directly to that person or entity, or indirectly through an intermediary—for the purpose of compensating them for performing an abortion and that such an abortion was actually performed.  Because the petitioner's complaint did not allege that the State made such a payment, the complaint failed to state a claim for relief under C.R.C.P. 12(b)(5).  Accordingly, the supreme court affirms the judgment of the court of appeals.

## The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

---

### 2018 CO 3

---

### Supreme Court Case No. 16SC112
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 14CA1816

---

#### Petitioner:

Jane E. Norton,

v.

#### Respondents:

Rocky Mountain Planned Parenthood, Inc. a/k/a Planned Parenthood of the Rocky Mountains, Inc., a Colorado nonprofit corporation; John W. Hickenlooper, in his official capacity as Governor of the State of Colorado; Susan E. Birch, in her official capacity as Executive Director of the Colorado Department of Health Care Policy and Financing; and Larry Wolk, in his official capacity as Executive Director of the Colorado Department of Public Health & Environment.

---

#### Judgment Affirmed
*en banc*
January 22, 2018

---

**Attorneys for Petitioner:**
Michael J. Norton
  *Greenwood Village, Colorado*

The Law Office of Natalie L. Decker, LLC
Natalie L. Decker
  *Littleton, Colorado*

**Attorneys for Respondent Rocky Mountain Planned Parenthood, Inc.:**
Heizer Paul LLP
Kevin C. Paul
Cynthia A. Coleman
  *Denver, Colorado*

**Attorneys for Respondents John W. Hickenlooper, Susan E. Birch, and Larry Wolk:**
Cynthia H. Coffman, Attorney General
W. Eric Kuhn, Senior Assistant Attorney General
  *Denver, Colorado*

**Attorneys for Amici Curiae Colorado Family Action, Genesis Family Church, Kingdom Way Ministries, Summit Ministries, and Christina Darlington:**
SDG Law LLC
David M. Hyams
  *Denver, Colorado*

**Attorneys for Amici Curiae Faith and Freedom Coalition of Colorado, Family Talk, Dr. James Dobson, and the Colson Center for Christian Worldview:**
MRDLaw
Michael Francisco
  *Denver, Colorado*

**CHIEF JUSTICE RICE** delivered the Opinion of the Court.
**JUSTICE BOATRIGHT** dissents, and **JUSTICE COATS** joins in the dissent.

¶1 In this case, we consider whether a complaint alleging a violation of article V, section 50 of the Colorado Constitution ("section 50") based solely on a theory of subsidization states a claim for relief sufficient to overcome a motion to dismiss pursuant to C.R.C.P. 12(b)(5). We hold that it does not. Instead we hold that to state a claim for relief under section 50, a complaint must allege that the State made a payment to a person or entity—whether directly to that person or entity, or indirectly through an intermediary—for the purpose of compensating them for performing an abortion and that such an abortion was actually performed.

## I. Facts and Procedural History

¶2 Petitioner Jane E. Norton sued Rocky Mountain Planned Parenthood, Inc. ("RMPP"), Governor John W. Hickenlooper, the Executive Director of the Colorado Department of Health Care Policy and Financing, and the Executive Director of the Colorado Department of Public Health and Environment ("CDPHE"), for violating section 50. Section 50 provides, "No public funds shall be used by the State of Colorado, its agencies or political subdivisions to pay or otherwise reimburse, either directly or indirectly, any person, agency or facility for the performance of any induced abortion . . . ."

¶3 Prior to filing this suit as a private citizen, Norton had served as Executive Director of CDPHE. In 2001, while serving in that role, Norton hired an accounting firm to determine whether RMPP was "separately incorporated, maintain[ed] separate facilities, and maintain[ed] financial records which demonstrate[d] financial independence" from Planned Parenthood of the Rocky Mountains Services Corporation

3

("Services Corp."), an organization that offers abortion services. The accounting firm determined that RMPP was "subsidizing the rent for Services Corp., an affiliate that performs abortions." From this information, Norton concluded that whenever CDPHE provided funding to RMPP, for example by contracting with RMPP to perform breast and cervical cancer screenings, it was violating section 50. As a result, Norton terminated the State's contractual relationship with RMPP and ceased all taxpayer funding of that organization. In 2009, after Norton had left CDPHE, the State resumed making payments to RMPP, prompting Norton to file this lawsuit in which she sought declaratory and injunctive relief against the State officials and pursued a claim of unjust enrichment against RMPP.

¶4 Norton alleged in her complaint that the State officials violated section 50 by paying approximately $14 million[1] of public funds to RMPP for non-abortion medical services. Specifically, Norton's complaint alleged that, in making these payments, the State subsidized the abortion operations of Services Corp., because giving state funds to RMPP allowed RMPP to charge below-market rent to Services Corp. for the use of RMPP's facilities. Norton did not allege that the State paid public funds to RMPP or to Services Corp. to compensate either organization for actually performing abortions.

¶5 The trial court dismissed Norton's complaint under C.R.C.P. 12(b)(5) for failure to state a claim, concluding that Norton did not allege "any specific abortion that is being supported with [state funds]." The trial court reasoned that, in order to fall

___

[1] The trial court determined that only $1.4 million of the funds identified in Norton's complaint were state funds.

within the scope of section 50, a payment made by the State, whether directly or indirectly, to a health care provider must be connected to the performance of an abortion.

¶6 The court of appeals affirmed, holding that the language of section 50 "requires that the <u>purpose</u> for which the State makes the payment be analyzed." <u>Norton v. Rocky Mountain Planned Parenthood, Inc.</u>, 2016 COA 3, ¶ 17, __ P.3d __. The court of appeals concluded that if it were to adopt Norton's interpretation of "directly or indirectly" to refer to how the funds ultimately are used by the <u>payee</u>, it would lead to an absurd result. <u>Id.</u> at ¶ 24. For example, the State pays salaries to its employees. The court of appeals reasoned that if one of those employees donated money to Services Corp., under Norton's interpretation, the payment of salary to the employee would be an indirect payment for an induced abortion and would violate section 50. <u>Id.</u> The court of appeals held that this result cannot have been intended by the electorate when it enacted section 50 because the connection to an induced abortion is too attenuated from the reason for the initial payment of salary to the employee. <u>Id.</u> The court of appeals concluded that because, in this example, the State paid the employee for services other than performing induced abortions, section 50 was not violated. <u>Id.</u> The court of appeals held that the same is true for the State paying RMPP for services other than performing induced abortions. <u>Id.</u> at ¶ 25. Accordingly, the court of appeals concluded that, because Norton did not allege that the State made payments to RMPP or Services

5

Corp. for the purpose of reimbursing them for performing abortion services, the trial court properly dismissed the complaint. Id. at ¶ 26. We granted certiorari.[2]

## II. Standard of Review

¶7     We review a C.R.C.P. 12(b)(5) motion to dismiss de novo and apply the same standards as the trial court. Denver Post Corp. v. Ritter, 255 P.3d 1083, 1088 (Colo. 2011). We accept all factual allegations in the complaint as true, viewing them in the light most favorable to the plaintiff, but we are not required to accept bare legal conclusions as true. Id. We will uphold the grant of a C.R.C.P. 12(b)(5) motion only when the plaintiff's factual allegations do not, as a matter of law, support the claim for relief. Id. When considering a motion to dismiss for failure to state a claim, we may consider the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference, and matters proper for judicial notice. Id.

¶8     The interpretation of a constitutional provision is a question of law that we review de novo. Gessler v. Colo. Common Cause, 2014 CO 44, ¶ 7, 327 P.3d 232, 235. "When interpreting a constitutional amendment adopted by citizen's initiative, we 'give effect to the electorate's intent in enacting the amendment.'" Dwyer v. State, 2015 CO 58, ¶ 19, 357 P.3d 185, 191 (quoting Colo. Ethics Watch v. Senate Majority Fund, LLC, 2012 CO 12, ¶ 20, 269 P.3d 1248, 1253). To this end, words used in the Constitution are

---

[2] We granted certiorari to review the following issue:

1. [REFRAMED] Whether the court of appeals erred in interpreting Colo. Const. art. V, section 50 to bar the use of state funds to pay for the performance of any induced abortion only to the extent that the performance of an induced abortion is the purpose for which the state makes the payment.

to be given "the natural and popular meaning usually understood by the people who adopted them." Urbish v. Lamm, 761 P.2d 756, 760 (Colo. 1988). If the language of a constitutional provision is clear and unambiguous, we will enforce it as written. Colo. Ethics Watch, ¶ 20, 269 P.3d at 1254.

### III. Analysis

¶9 Norton argues that her complaint alleged a violation of section 50 by stating that (1) the State made payments to RMPP using public funds; (2) RMPP and Services Corp. are "conjoined, interrelated, and integrated affiliates"; and (3) Services Corp. offers abortion services. Norton thus contends that, regardless of what the payments are for, when the State pays any public funds to RMPP, it "indirectly" pays for the abortion operations of Services Corp. in violation of section 50. Under Norton's theory, when the State pays RMPP for any service, RMPP earns a profit, making it possible for RMPP to subsidize Services Corp. by charging below-market rent and sharing medical staff and supplies.

¶10 We conclude that section 50 does not support a claim alleging a violation based on such a theory of subsidization. We reach this conclusion by reviewing section 50's plain language, focusing in particular on the terms "pay for" and "indirectly." Consistent with the unambiguous meaning of those terms, we hold that, to state a claim for relief under section 50, a plaintiff must allege that the State paid or reimbursed some entity, either directly or indirectly (i.e., through an intermediary), in exchange for that entity's performance of an induced abortion. Applying our holding, we determine that, because Norton did not allege that the State paid any entity for actually performing

abortions, she did not state a claim for relief under section 50 and the trial court properly dismissed her complaint.

## A. Section 50 Prohibits Only State Payments for a Specific Service

¶11 Section 50 prohibits the State from spending public funds "to pay or otherwise reimburse, either directly or <u>indirectly</u>, any person, agency or facility <u>for the performance of any induced abortion.</u>" (Emphasis added.) Norton argues that the word "indirectly" prohibits the State from paying organizations that offer abortion services—or entities closely affiliated with organizations that perform abortions—for any reason. Paying these organizations for any service, she argues, subsidizes their abortion operations in violation of section 50. We disagree. Norton misinterprets the term "indirectly" and ignores the key phrase in section 50 that identifies the specific procedure that the State is prohibited from paying for: "the performance of any induced abortion."

¶12 Our resolution of this case turns on the meaning of the words "pay for" and "indirectly" in section 50. The phrase "pay . . . for" in section 50 is a prepositional verb completed by its object, the phrase "the performance of any induced abortion." Thus, the phrase "the performance of any induced abortion" tells the State which specific service it cannot pay <u>for</u>. The preposition "for" means "in order to bring about or further," or "in order to obtain." <u>For</u>, <u>Webster's Third New International Dictionary</u> (unabr. ed. 2002). Therefore, the sentence "[n]o public funds shall be used by [the State] to pay . . . [any entity] for the performance of any induced abortion" prohibits the State from paying public funds to any entity in order to "bring about" or "obtain" the

8

performance of an induced abortion. Thus, section 50 focuses on the <u>service</u> that the State pays for in exchange for its money. Notably, Section 50 does not bar the State from contracting with an entire class of health care providers, although other states have adopted such provisions. For example, a statute in Indiana bars the Indiana state government from contracting with or making grants to "any entity that performs abortions or maintains or operates a facility where abortions are performed that involves the expenditure of state funds or federal funds administered by the state." Ind. Code § 5-22-17-5.5 (2017). Section 50 does not go that far. Instead, it bars the State only from using public funds to pay for one specific medical service.

¶13 Norton nevertheless seizes upon the word "indirectly," arguing that the State so paid Services Corp. for the performance of induced abortions by actually paying its affiliate, RMPP, for non-abortion medical services. We disagree.

¶14 In <u>Keim v. Douglas Cty. School Dist.</u>, 2017 CO 81, ¶ 32, 397 P.3d 377, 385, we held that the phrase "directly or indirectly," as it relates to a provision within Colorado's Fair Campaign Practices Act ("FCPA"), § 1-45-117(1)(a)(I), C.R.S. (2017), encompasses an intermediary theory. In that case, we interpreted the FCPA, which prohibits political subdivisions from making "contributions" in certain campaigns. <u>Keim</u>, ¶ 23, 397 P.3d at 382–83. The FCPA adopts the definition of "contribution" used in article XXVIII, section 2(5) of the Colorado Constitution. § 1-45-103(6)(a), C.R.S. (2017). <u>Keim</u> interpreted article XXVIII, section 2(5)(a)(IV), which defines "contribution" as "anything of value given, directly or indirectly, to a candidate for the purpose of promoting the candidate's . . . election." <u>Keim</u>, ¶ 20, 397 P.3d at 382.

9

We held that the phrase "directly or indirectly" in section 2(5)(a)(IV) modifies the contributor's act of <u>giving</u> to the candidate, meaning a candidate may receive a thing of value in two ways: "directly" from the contributor or "indirectly" through one or more intermediaries. <u>Id.</u> at ¶ 28, 397 P.3d at 384. In either case, we held, the candidate must ultimately receive the thing of value given by the contributor. <u>Id.</u> Thus, in the FCPA context, "indirectly" refers to contributions that are actually received by the candidate, but arrive to that candidate through an intermediary. <u>Id.</u>

¶15 The phrase "directly or indirectly" performs the same function in section 50. Here, "directly or indirectly" modifies the State's act of <u>paying</u> a health care provider for the performance of an abortion, meaning the State can violate section 50 in two ways: by paying some entity directly for performing an abortion, or by paying an intermediary who then pays some entity for performing an abortion. In either case, the State must make the payment for the purpose of compensating a health care provider for performing an induced abortion. For example, section 50 prohibits the State from paying or reimbursing a physician for abortion care directly, e.g., writing a check to the physician to compensate them for performing that specific service. Section 50 also prohibits the State from paying a physician for abortion care through an intermediary such as a health maintenance organization ("HMO").[3]

---

[3] As Colorado Attorney General Duane Woodard explained in a 1985 Advisory Opinion, section 50 prohibits the State from using public funds to pay the premium for an HMO that pays for abortion care as a benefit to State employees. Op. Att'y Gen., No. AD AC AGANY, 1985 WL 194202, at *2 (Feb. 6, 1985). By paying the premiums to

¶16 Accordingly, we hold that to state a claim for a violation of section 50, a complaint must allege that the State made a payment to a person or entity—whether directly to that person or entity, or indirectly through an intermediary—for the purpose of compensating them for performing an abortion and that such an abortion was actually performed.

¶17 Having reached this conclusion, we now consider whether Norton's complaint stated a claim for relief.

## B. Norton's Complaint Fails to State a Claim for Relief

¶18 As explained above, section 50 prohibits the State from paying public funds for a specific purpose—to obtain or bring about an abortion procedure. Therefore, even accepting the factual allegations in Norton's complaint as true, her complaint does not state a claim for relief under section 50. Norton alleged that the State paid money to RMPP and that RMPP uses its income to subsidize the operations of Services Corp. But she did not allege that either RMPP or Services Corp. actually performed abortions in exchange for State funds. To the contrary, the trial court found that all of the funds the State paid to RMPP financed non-abortion medical procedures, including breast and cervical-cancer screenings. Norton argues that her subsidization theory is an indirect payment for an abortion, just like the HMO example, but the two are different in kind. In the HMO example, a physician provides an induced abortion in exchange for payment from the HMO, an account of State funds set aside for the purpose of paying

the HMO which, in turn, pays the medical provider for abortion procedures, the State indirectly pays for the performance of induced abortions. Id.

11

medical expenses.  In contrast, Norton did not allege that the State paid or reimbursed RMPP for actually providing an abortion.  Accordingly, the trial court properly dismissed Norton's complaint for failure to state a claim.

## III.  Conclusion

¶19     For the foregoing reasons, we hold that the State does not violate section 50 when it pays RMPP for non-abortion medical services.  To state a claim for relief under section 50, a plaintiff must allege that the State paid or reimbursed some entity, either directly or indirectly (through an intermediary), to provide an abortion.  Because Norton did not allege that the State paid or reimbursed RMPP, directly or indirectly, for providing an abortion, the trial court properly dismissed her complaint under C.R.C.P. 12(b)(5).  Accordingly, we affirm the judgment of the court of appeals.


**JUSTICE BOATRIGHT** dissents, and **JUSTICE COATS** joins in the dissent.

JUSTICE BOATRIGHT, dissenting.

¶20     An amendment to the Colorado Constitution prohibits the State from using public funds "directly or indirectly" for abortion services. Colo. Const. art. V, § 50. That language is very broad. It makes clear that state funds are not to be used in any way to fund abortion services. The amendment does not mention the State's purpose for using the funds. In fact, the words "intent" or "purpose" are completely absent. Nevertheless, today the majority creates a "purpose" requirement and grafts it onto the amendment. But the plain language of the Constitution does not support such a purpose requirement; instead, the amendment focuses exclusively on how the funds are ultimately used. For this reason, I respectfully dissent.

¶21     Article V, section 50 of the Colorado Constitution states, in relevant part: "No public funds shall be used by the State of Colorado, its agencies or political subdivisions to pay or otherwise reimburse, either directly or indirectly, any person, agency or facility for the performance of any induced abortion." Based on this language, I believe that a complaint alleging that State funds are being used for abortion services, directly or indirectly, states a sufficient claim for purposes of C.R.C.P. 12(b)(5). The majority, however, holds that a plaintiff must additionally allege that the State made a payment to a person or entity for the purpose of paying for abortion services, and that the party here, Jane Norton, did not make such an allegation. Hence, the majority concludes that Norton's complaint was properly dismissed for failing to state a claim upon which relief can be granted under C.R.C.P. 12(b)(5). Maj. op. ¶ 1.

1

¶22 Motions to dismiss under Rule 12(b)(5) are generally viewed unfavorably. Denver Post Corp. v. Ritter, 255 P.3d 1083, 1088 (Colo. 2011). A complaint will survive a motion to dismiss if, accepting all the factual allegations in the complaint as true, the complaint states a plausible claim for relief. See Warne v. Hall, 2016 CO 50, ¶¶ 9, 24, 327 P.3d 588, 591, 595 (explaining the federal pleading standard and adopting it in Colorado).

¶23 Norton's complaint begins by describing the amendment at issue, which prohibits the State from directly or indirectly funding abortion services. It then alleges, in detail, that the State provides funds to RMPP, RMPP provides a rent subsidy to its Services Corp., and the Services Corp. performs abortion services. Then, logically following the flow of money from the State to the Services Corp., the complaint alleges that the State has "directly or indirectly subsidized [Planned Parenthood's Services Corp.]." Therefore, accepting all the factual allegations in the complaint as true, the complaint plausibly articulates that the State is indirectly funding abortion services and thus meets the requirements to state a claim for a violation of section 50.

¶24 Yet the majority holds that Norton did not plead sufficient facts because she did not allege that the State paid RMPP for the purpose of performing abortion services. Maj. op. ¶ 18. Of course she did not allege that the State paid RMPP for the purpose of performing abortion services; the plain language of section 50 does not require payments to be made with the purpose of performing abortion services. Thus, the only way the majority can conclude that Norton failed to state a claim is to add language to section 50 in the form of a purpose requirement. This it may not do.

2

¶25    When interpreting a constitutional amendment, we must not add words that the amendment does not contain, see Turbyne v. People, 151 P.3d 563, 567 (Colo. 2007), and we must avoid unreasonable interpretations that lead to absurd results, Huber v. Colo. Mining Ass'n, 264 P.3d 884, 889 (Colo. 2011).  As I have discussed, the amendment is silent as to the State's purpose in providing the funds.  From this silence, the majority extracts a purpose requirement.  But such an interpretation would not be necessary if the majority followed the amendment's plain language, which imposes no such purpose requirement.

¶26    The majority creates the "purpose" requirement by analyzing the words "pay for" and "indirectly" in the amendment.  Maj. op. ¶ 12.  In doing so, it relies on our statutory analysis in Keim v. Douglas Cty. Sch. Dist., 2017 CO 81, 397 P.3d 377.  See maj. op. ¶¶ 14–17.  Keim concerns a dispute that arose when the Douglas County School Board sent information to potential voters during a pending election.  See Keim, ¶ 1, 397 P.3d at 378.  We analyzed whether that was a violation of the Colorado Fair Campaign Practices Act ("FCPA").  Id. at ¶¶ 30–34, 397 P.3d at 385–86.  The FCPA prohibits political subdivisions of the state from making contributions that would taint the electoral process.  Id. at ¶ 23, 397 P.3d at 382.  Specifically, the statute prohibits political subdivisions of the state from making contributions "to urge electors to vote in favor of or against" any ballot issue, referred measure, or recall measure.  See § 1-45-117(1)(a)(I), C.R.S. (2017).  More simply, the statute prohibits a subdivision of the State from making contributions for the purpose of persuading electors.  Thus, in Keim, the statute in question required us to look at the purpose of the expenditure.

¶27 As such, there is a fundamental difference between the statute in <u>Keim</u> and the amendment we interpret today; the statute in <u>Keim</u> contained a prohibited <u>purpose</u> for expenditures, while the amendment here contains a prohibited <u>use</u> of expenditures. That difference renders the majority's reliance on <u>Keim</u> misplaced.

¶28 By focusing on the State's purpose for providing the funds, the majority renders section 50 practically unenforceable. Apparently, the State can now give funds to any facility that provides abortion services without running afoul of Colorado's constitution, so long as the money is not specifically earmarked for abortion services. In my view, that is not what the voters intended in enacting this constitutional amendment. They intended that no taxpayer dollars be used to fund abortion services.

¶29 Norton's civil action is at its inception. Only a complaint and a motion to dismiss have been filed. At this juncture, the only issue is whether the complaint states a claim for relief. The majority concludes that it does not. I disagree. I would instead hold that Norton's complaint plausibly alleges that the State is indirectly funding abortion services, based on the plain language of article V, section 50, and thus states a claim. At the very least, the majority should remand this case with instructions to allow Norton to amend her complaint if she so chooses, so that she may plead facts to meet this new purpose requirement.

¶30 I therefore respectfully dissent.