2015 CO 58

In re: Lindi DWYER and Paul Dwyer, as individuals and parents of Jayda Dwyer, Joslyn Dwyer, Janesha Dwyer, and Jentri Dwyer; Terri Siewiyumptewa, as an individual and as parent and natural guardian of Shane Siewiyumptewa and Kristen Johnson; Tracey Weeks and Monty Weeks, as individuals and as parents of Jared Weeks and Jordyn Weeks; Terri Piland and Jeffrey Piland, as individuals and as parents of Joseph Piland and George Piland; Colorado Rural Schools Caucus a/k/a Rural Alliance; East Central Board of Cooperative Educational Services; Colorado PTA; Boulder Valley School District; Colorado Springs School District No. 11; Mancos School District; Holyoke School District; and Plateau Valley School District 50, Plaintiffs,

v.

The STATE of Colorado; Robert Hammond, in his official capacity as Commissioner of Education of the State of Colorado; and John Hickenlooper, in his official capacity as Governor of the State of Colorado, Defendants.

Supreme Court Case No. 15SA22

Supreme Court of Colorado.

September 21, 2015

Attorneys for Plaintiffs: Arnold & Porter LLP, Timothy P. Macdonald, Nathaniel J. Hake, Reilly Pozner LLP, Sean Connelly, Bryan Cave LLP, Zhonette M. Brown, Denver, Colorado, Kathleen J. Gebhardt LLC, Kathleen J. Gebhardt, Boulder, Colorado.

Attorneys for Defendants: Cynthia H. Coffman, Attorney General, Frederick R. Yarger, Solicitor General, Michelle Merz–Hutchinson, First Assistant Attorney General, Antony B. Dyl, Senior Assistant Attorney General and Assistant Solicitor General, Jonathan P. Fero, Senior Assistant Attorney General and Assistant Solicitor General, William V. Allen, Senior Assistant Attorney General, Davin Dahl, Assistant Attorney General, Kathryn Starnella, Assistant Attorney General, Denver, Colorado.

Attorneys for Amici Curiae Colorado Association of School Boards, Colorado Association of School Executives, and Colorado BOCES Association: Colorado Association of School Boards, Kathleen A. Sullivan, Denver, Colorado.

Attorneys for Amici Curiae Colorado Concern, Denver Metro Chamber of Commerce,

Colorado Competitive Council, Colorado Mining Association, Colorado Association of Mechanical and Plumbing Contractors, National Federation of Independent Business, and Associated General Contractors of Colorado: Brownstein Hyatt Farber Schreck, LLP, Jason R. Dunn, Denver, Colorado.

Attorneys for Amicus Curiae Colorado Education Association: Colorado Education Association, Kris Gomez, Denver, Colorado, National Education Association, Alice O'Brien, Eric Harrington, Kristen Hollar, Washington, DC.

Attorneys for Amicus Curiae Colorado Fiscal Institute: Heizer Paul LLP, Edward T. Ramey, Denver, Colorado.

Attorney for Amicus Curiae The Colorado Hispanic Bar Association: Daniel Spivey, Denver, Colorado.

Attorneys for Amicus Curiae Department of Business Officials of the Colorado Association of School Executives: Davis Graham & Stubbs, LLP, Terry R. Miller, Kenzo Kawanabe, Anna–Liisa Mullis, Emily Wasserman, Denver, Colorado.

Attorneys for Amici Curiae Great Education Colorado, Education Foundation of Eagle County, Grassroots St. Vrain, and Colorado Latino Forum's Denver Metro Chapter: Faegre Baker Daniels LLP, David W. Stark, Jennifer K. Harrison, Denver, Colorado.

CHIEF JUSTICE RICE delivered the Opinion of the Court.

¶ 1 In this original proceeding, we consider the legality of the "negative factor," a legislative enactment that operates to reduce education funding across all Colorado school districts. Plaintiffs below sued the State of Colorado, the Commissioner of Education, and the Governor (collectively, "the State"), arguing that the negative factor is unconstitutional because it violates Amendment 23, a constitutional provision requiring annual increases to "statewide base per pupil funding." After the trial court denied the State's motion to dismiss, we issued a rule to show cause why the motion should not be granted. We now conclude that Plaintiffs' complaint misconstrues the relationship between the negative factor and Amendment 23. By its plain language, Amendment 23 only requires increases to statewide *base* per pupil funding, not to *total* per pupil funding. We therefore hold that the negative factor does not violate Amendment 23. Accordingly, we make the rule absolute, and we remand the case to the trial court with instructions to dismiss Plaintiffs' complaint.

## I. Facts and Procedural History

¶ 2 In 2000, Colorado voters passed Amendment 23, which requires annual increases to "statewide base per pupil funding" for public education. *See* Colo. Const. art. IX, § 17(1) ("Amendment 23"). Ten years later, the General Assembly determined that "stabilization of the state budget requires a reduction in the amount of the annual appropriation to fund the state's share of total [education] funding." § 22–54–104(5)(g)(I), C.R.S. (2010). To accomplish this, it implemented the negative factor. *See* § 22–54–104(5)(g), C.R.S. (2011). The negative factor effectuates the General Assembly's goal by reducing each district's school funding by a fixed percentage. *See infra* ¶ 11.

¶ 3 Plaintiffs sued the State for declaratory and injunctive relief, arguing that the negative factor violates Amendment 23 and is thus unconstitutional. The trial court denied the State's motion to dismiss, finding that "Plaintiffs have alleged sufficient facts." The State petitioned us to exercise our original jurisdiction under C.A.R. 21. We issued a rule to show cause why the motion to dismiss should not be granted.[1]

## II. Original Jurisdiction

¶ 4 "Original relief pursuant to C.A.R. 21 is an extraordinary remedy that is limited both in purpose and availability." *People v. Kailey*, 2014 CO 50, ¶ 9, 333 P.3d 89, 92. Despite this, we "generally elect to

---

1. In its motion to dismiss, the State also argued that the trial court lacked subject matter jurisdiction and that Plaintiffs lacked standing. Because the State did not pursue these arguments in its petition for a rule to show cause, we do not address them here.

hear C.A.R. 21 cases that raise issues of first impression and that are of significant public importance." *In re Marriage of Wiggins*, 2012 CO 44, ¶ 12, 279 P.3d 1, 5. The question presented in this case—which implicates the apportionment of nearly one billion dollars of state funding—is undeniably such an issue. Furthermore, because Plaintiffs' complaint presents a pure question of law, the existing record is sufficient, and allowing the case to proceed to trial would not further clarify the question of the negative factor's constitutionality.

### III. Standard of Review

¶ 5 The constitutionality of the negative factor is a question of law, which we review de novo. *See Kailey*, ¶ 12, 333 P.3d at 93. We presume that the negative factor is constitutional, and we will only void it if we deem it to be unconstitutional beyond a reasonable doubt. *See Justus v. State*, 2014 CO 75, ¶ 17, 336 P.3d 202, 208.

### IV. Analysis

¶ 6 To resolve the constitutionality of the negative factor, we begin by charting the recent history of education funding in Colorado, examining Amendment 23, the negative factor, and their respective impacts on the State's school funding formula. We then consider whether the negative factor violates Amendment 23's constitutional mandate. We conclude that, because Amendment 23 only requires increases to *base* per pupil funding, the negative factor does not violate the amendment.

### A. Education Funding in Colorado

¶ 7 Colorado awards education funding to individual school districts pursuant to the Public School Finance Act of 1994 ("the Act"). *See* §§ 22–54–101 to –137, C.R.S. (2015). Prior to the passage of Amendment 23, the Act calculated the "total program" funding for each district. *See* § 22–54–104(1), C.R.S. (2000). To do so, it first calculated a district's per pupil funding. *See* § 22–54–104(3), C.R.S. (2000). Per pupil funding could be broken into two main components: *base* funding and *factor* funding. Base funding, as designated by the term

"statewide base per pupil funding," was uniform for all districts. *See* § 22–54–104(5)(a), C.R.S. (2000) (specifying the amount of base per pupil funding for seven different budget years, including $3,878 (plus $123.70 to account for inflation) for 2000–01). Factor funding, in contrast, varied for each district based on four factors: the personnel costs factor, the cost of living factor, the nonpersonnel costs factor, and the size factor. *See* § 22–54–104(5)(b)–(e), C.R.S. (2000). The Act created a detailed framework to calculate these factors for each district. *See id.* It then combined these two components, computing each district's total per pupil funding according to the following formula:

((Statewide base per pupil funding x District personnel costs factor x District cost of living factor) + (Statewide base per pupil funding x District nonpersonnel costs factor x District size factor.

§ 22–54–104(3), C.R.S. (2000).

¶ 8 In addition to calculating per pupil funding, the Act determined each district's "at-risk funding," a computation involving a fifth factor, dubbed the "at-risk factor." *See* § 22–54–104(4), (5)(f), C.R.S. (2000). Finally, to derive the total program funding amount for each district, the Act multiplied the district's total per pupil funding by its "funded pupil count," then added the district's at-risk funding to that product. *See* § 22–54–104(2), C.R.S. (2000).

¶ 9 In 2000, voters passed Amendment 23. Although the amendment mandated changes to education funding, it did not alter the Act's formula. Rather, it required regular increases to one of the variables within that formula: statewide base per pupil funding. In particular, Amendment 23 provided that from 2001–02 through 2010–11, *"the statewide base per pupil funding,* as defined by the [Act] on the effective date of this section, for public education from preschool through the twelfth grade ... shall grow annually at least by the rate of inflation plus an additional one percentage point" (emphasis added). The amendment further provided that for 2011–12 "and each fiscal year thereafter, the statewide base per pupil funding for public education" shall grow by at least the rate of inflation (thereby eliminating the "additional

one percentage point" increase). In addition, the amendment demanded that ."*total* state funding for all categorical programs [2] shall grow annually" at the same rate (emphasis added). Following the passage of Amendment 23, the General Assembly methodically increased the designated amount of "statewide base per pupil funding" each year. *Compare* § 22–54–104(5)(a)(X), C.R.S. (2003) (providing for a base of $4,570.31 for 2003–04), *with* § 22–54–104(5)(a)(XVI), C.R.S. (2009) (providing for a base of $5,507.68 for 2009–10). Because the General Assembly did not otherwise change the Act's formula, these increases to the base resulted in commensurate increases to total education funding. *Compare* § 22–54–104(3), C.R.S. (2003), *with* § 22–54–104(3), C.R.S. (2009) (both ·establishing identical per pupil funding formulas).

¶ 10 In 2010, however, the General Assembly "determine[d] that stabilization of the state budget requires a reduction in the amount of the annual appropriation to fund the state's share of [education] funding for all districts." § 22–54–104(5)(g)(I), C.R.S. (2010). But while the General Assembly sought to decrease *total* education funding, it also needed to continue growing *base* .funding pursuant to Amendment 23. Thus, the General Assembly could only effectuate its goal of stabilizing the budget by reducing *factor*— not base—funding. To accomplish this, it implemented the negative factor.

¶ 11 Strictly speaking, the negative factor lowers neither base funding nor factor funding. Instead, the negative factor operates in concert with a hard statutory cap on *total* education funding. The Act's formula to determine school funding for each district— again, a combination of uniform base funding and district-specific factor funding—remains

intact. See § 22–54–104(2)(a)(IX), C.R.S. (2015). Now, however, total education funding *across the state* must equal a fixed statutory cap, albeit one that allows for Amendment 23's annual increases to statewide base per . pupil funding. *See, e.g.,* § 22–54–104(5)(g)(I)(F) (providing that, "for the 2015–16 budget year, the sum of the total program funding for all districts ... after application of the negative factor, is not less than" $6,233,955,737). To achieve this, the Act first calculates the *initial* statewide total, summing up each district's total funding pursuant to the original formula. *See* § 22–54–104(5)(g)(II)(A). It then subtracts the statutory cap (the *new* statewide total) from this amount, and it divides the difference by the initial statewide total to derive a percentage; this percentage is the negative factor. *See id.* Finally, for every district, the Act multiplies its initial total funding amount by the negative factor, then reduces the district's total funding by that· product. *See* § 22–54–104(5)(g)(II)(B).[3]

¶ 12 Because the negative factor's mechanics are so convoluted, we will clarify them through a hypothetical. Suppose that Colorado were composed of three school districts: A, B, and C. Suppose further that, prior to the ·negative factor, District A received $5 million in education funding, District B received $10 million, and District C received $15 million; this results in an initial statewide total of $30 million. But now suppose that the Act provided for a statutory cap of $27 million for statewide education funding. To determine the negative factor, the Department of Education would subtract $27 million from $30 million, then divide the difference ($3 million) by the initial statewide total ($30 million)—this yields a negative fac-

---

**2.** The amendment defined "categorical programs" as discrete educational programs—as distinct from general education—including "transportation programs, English language proficiency programs, expelled and at-risk student programs, special education programs (including gifted and talented programs), suspended student programs, vocational education programs, small attendance centers, comprehensive, health education programs, and other current and future accountable programs specifically identified in statute as a categorical program." ' Colo. Const. art. IX, § 17(2)(a).

**3.** For simplicity, our generalized walkthrough of . this scheme elides minor provisions elsewhere in the statute. *See, e.g.,* § 22–54–104(4.5) (calculating each district's "on-line funding"); § 22–54–104(4.7) (calculating each district's "extended high school funding"). These provisions produce a de minimis impact on school funding, and they are irrelevant to our analysis of whether the negative factor violates Amendment 23.

tor of ten percent. Then, pursuant to section 22–54–104(5)(g)(II)(B), each district's initial funding amount would be cut by this ten-percent negative factor. Thus, District A's funding would be reduced from $5 million to $4.5 million, District B's funding would diminish from $10 million to $9 million, and District C's funding would drop from $15 million to $13.5 million. As a result, the new statewide total for education funding—$4.5 million from District A, plus $9 million from District B, plus $13.5 million from District C—now equals the statutory cap of $27 million.

¶ 13 Now, to visualize the interplay between the negative factor and Amendment 23, consider District A in the context of per pupil funding. Recall that District A, prior to the negative factor, received $5 million in total education funding. *See supra* ¶12. Now suppose that District A has 500 pupils. Therefore, prior to the negative factor, District A's total per pupil funding would have been $10,000 ($5 million divided by 500 pupils). But because the ten-percent negative factor reduced District A's *total* funding from $5 million to $4.5 million, *see supra* ¶12, it commensurately reduced District A's *per pupil* funding from $10,000 to $9,000 ($4.5 million divided by 500 pupils). The question is whether this reduced level of per pupil funding has dropped below Amendment 23's mandated amount.

■ ¶ 14 To answer this question, suppose we are in the 2015–16 budget year. In that year, Amendment 23 required a base per pupil funding amount of $6,292.39. *See* § 22–54–104(5)(a)(XXII). Thus, before the negative factor, District A's total per pupil funding of $10,000 broke into two components: $6,292.39 in base per pupil funding, plus an additional $3,707.61 in factor funding. After the negative factor, District A's total per pupil funding dropped to $9,000: the same $6,292.39 in base per pupil funding, plus a reduced $2,707.61 in factor funding. As such, despite the negative factor's applica-

tion, District A's lower per pupil funding amount ($9,000) remains above the constitutionally mandated base per pupil funding amount ($6,292.39). Thus, in practical terms, the negative factor has decreased District A's *factor* funding by $1,000 without diminishing its *base* funding.[4]

¶ 15 This hypothetical illustrates the theory behind the negative factor: how it reduces total education funding, but not so drastically as to drop any individual district's total per pupil funding below the required base. The question, of course, is whether the procedure demonstrated in this hypothetical is in fact constitutional. Having examined the relevant statutory framework, we now address whether the negative factor has unconstitutionally diminished statewide base per pupil funding below the levels required by Amendment 23.

## B. The Negative Factor Has Not Violated Amendment 23

¶ 16 As we have demonstrated, the practical operation of the negative factor is highly intricate. Legally speaking, however, Plaintiffs' challenge to the negative factor presents a surprisingly straightforward question of constitutional interpretation. Quite simply, this case is about one thing: the meaning of the term "base."

¶ 17 The State essentially argues that "base" is synonymous with "floor." It contends that Amendment 23 only requires incremental increases to the *floor* set by the Act's finance formula, and that the General Assembly retains discretion to adjust additional funding as allocated by the factors. As such, the State distinguishes "base" from "total," positing that while Amendment 23 mandates increases to *base* per pupil funding, it does not in the same breath prohibit decreases to *total* per pupil funding.

¶ 18 Plaintiffs' proffered definition of "base" is more creative. They contend that, in using the word "base," Amendment 23

4. For brevity, this hypothetical only applies to a single budgetary year. Going forward, Amendment 23 will continue to elevate the minimum statewide base per pupil funding threshold every year. The General Assembly has accounted for these annual increases by continually raising the statutory cap on total statewide funding. *See* § 22–54–104(5)(g) (memorializing the statutory cap for different fiscal years, including $5,225,244,885 in 2010–11, $5,524,046,767 in 2013–14, and $6,233,955,737 in 2015–16).

necessarily intended to "capture the essential qualities" of the variable called the "base." Response Brief at 23 (emphasis removed). They further contend that the base's "essential quality ... made it the starting point to be increased formulaically by [the] factors," thereby "yielding higher per pupil funding." *Id.* (emphasis removed). Thus, Plaintiffs argue that Amendment 23 requires increases to *total* per pupil funding, as effected through adjustments to the base.

¶ 19 To resolve this dispute, we need only turn to our standard principles of constitutional interpretation. "When interpreting a constitutional amendment adopted by citizen's initiative, we 'give effect to the electorate's intent in enacting the amendment.'" *Colo. Ethics Watch v. Senate Majority Fund, LLC,* 2012 CO 12, ¶ 20, 269 P.3d 1248, 1253 (quoting *Davidson v. Sandstrom,* 83 P.3d 648, 654 (Colo.2004)). To do so, we "give words their ordinary and popular meaning." *Id.,* 269 P.3d at 1253–54. Thus, we have recognized that "[i]f the language of an amendment is clear and unambiguous, then it must be enforced as written." *Id.,* 269 P.3d at 1254. Only where the amendment's language "is susceptible to multiple interpretations" do we look beyond it to ascertain the voters' intent. *See id.; see also Sandstrom,* 83 P.3d at 654–55 ("If the intent of the voters cannot be discerned from the language ... [c]ourts may determine [it] 'by considering other relevant materials such as the ballot title and submission clause and the biennial "Bluebook," which is the analysis of ballot proposals prepared by the legislature.'" (quoting *In re Submission of Interrogatories on House Bill 99–1325,* 979 P.2d 549, 554 (Colo.1999))). Finally, we note that voters "must be presumed to know the existing law at the time they amend or clarify

that law." *Common Sense Alliance v. Davidson,* 995 P.2d 748, 754 (Colo.2000).

¶ 20 These principles compel the conclusion that Amendment 23 only requires increases to statewide *base* per pupil funding, not *total* per pupil funding. We know that this is what Amendment 23 means, because this is exactly what Amendment 23 says. Once again, the amendment provides for annual increases to "statewide base per pupil funding, as defined by the [Act] on the effective date of this section." That "effective date" was the year 2000. The term "statewide base per pupil funding" appeared a dozen times in the 2000 version of the Act, and each time, its meaning was clear: It was a single variable within the Act's larger per pupil funding formula. *See* § 22–54–104(3), C.R.S. (2000). Therefore, Amendment 23 does not demand that total per pupil funding increase; it merely requires that this single variable increase.[5]

¶ 21 The additional language in Amendment 23 only buttresses our conclusion. To wit, in addition to requiring annual increases of "statewide *base* per pupil funding ... for public education from preschool through the twelfth grade," Amendment 23 further mandates annual increases of "*total* state funding for all categorical programs" (emphasis added). This discrepancy between "base" and "total" cannot be accidental. Rather, it is reflective of the voters' intent to adjust school funding in two different ways: increasing *base* per pupil funding for standard public education, and augmenting *total* funding for categorical programs. If voters had wished to increase "total" per pupil funding rather than "base" per pupil funding, they would have said so.

---

5. Plaintiffs point out that "statewide base per pupil funding" does not appear in the "definitions" section of the 2000 Act. *See* § 22–54–103, C.R.S. (2000). They thus contend that the term was necessarily ambiguous at the time of the enactment. But this construction is far too severe. Section 22–54–104, the provision in which the term appears (and the fulcrum of the State's entire system of awarding school funding), contains a multitude of other terms that are critical to the formula but do not appear in the "definitions" section. For example, section 22–54–104(5)(b) explains in detail how to calculate a district's "size factor." Yet under Plaintiffs' theory, this procedure would be rendered ambiguous because the term "size factor" does not appear in the "definitions" section of the Act. Such a result is patently illogical, as is declaring "statewide base per pupil funding"—a term that section 22–54–104(5)(a) quantitatively defines for seven different budget years—to be ambiguous simply because it does not appear in section 22–54–103. That a term is absent from a statute's "definitions" section does not automatically mean that the entire statute fails to define that term.

¶ 22 Plaintiffs argue that interpreting Amendment 23 in this fashion produces an absurd result. *See Bickel v. City of Boulder*, 885 P.2d 215, 229 (Colo.1994) ("[A]n unjust, absurd or unreasonable result should be avoided when construing a constitutional provision."). To be sure, we are mindful that we must not engage in overly technical constructions of constitutional amendments if doing so would contravene the voters' intent. *See Sandstrom*, 83 P.3d at 654. But our interpretation of Amendment 23—a reading rooted in the amendment's plain language—is neither overly technical nor absurd. It is hardly technical to interpret the term "statewide base per pupil funding" precisely as it was defined in the Act, especially given that Amendment 23 explicitly incorporates that definition. *See* § 22–54–104(5)(a), C.R.S. (2000). And it was perfectly rational, not absurd, for voters to insist that the State annually increase base per pupil funding (which is uniform across all school districts) while simultaneously affording the General Assembly discretion to modify factor funding (which is specific to each individual district).

¶ 23 Of course, the negative factor calculation does not hinge on the particular characteristics of a given district; rather, the negative factor cuts every district's funding by the same percentage. *See supra* ¶ 11. Seizing on this, Plaintiffs advance a complex supplemental argument. They contend that, because the General Assembly is reducing total education funding without adjusting any of the district-specific factors, such cuts must stem from reductions to the other element in the funding formula, i.e., the base.

¶ 24 Plaintiffs miss the forest for the trees. The *origin* of the funding reduction is irrelevant. The *result* of the reduction—that is, whether the State has reduced any district's per pupil funding below the base level set by Amendment 23—is all that matters. The State has not done so, and in fact, Plaintiffs do not allege otherwise. Instead, Plaintiffs allege that the State has reduced statewide base per pupil funding below *Plaintiffs' proposed definition* of the term. As we have established, this definition is incompatible with the plain language of Amendment 23. Therefore, Plaintiffs' complaint stems from a faulty premise, and their mathematical argument is thus a red herring.[6] At the end of the day, the State has not reduced statewide base per pupil funding below its constitutional minimum. That fact torpedoes Plaintiffs' lawsuit.

¶ 25 Finally, we reject Plaintiffs' contention that the Act's inclusion of a "savings clause" proves that the negative factor is unconstitutional. This savings clause provides that a district's total funding "shall be the greater of" (a) the amount as calculated by the standard formula and the negative factor, or (b) the minimum level of base funding multiplied by the district's number of pupils. *See* § 22–54–104(5)(g)(III), C.R.S. (2015). Essentially, the savings clause functions as a failsafe. It ensures that, in the event that the negative factor *did* reduce funding levels for a particular district below those mandated by Amendment 23, that district would still receive its minimum amount of base funding in compliance with the amendment. Thus, the savings clause makes certain that the very theory of Plaintiffs' case—i.e., that the negative factor reduces a district's funding below constitutionally prescribed levels—never becomes a reality. Therefore, contrary to revealing the negative factor's constitutional infirmity (as Plaintiffs contend), the savings clause does the exact opposite: It ensures that the negative factor *cannot* function to violate Amendment 23.

¶ 26 In sum, we conclude that "statewide base per pupil funding" as articulated in Amendment 23 refers only to that single variable within the Act's school finance formula, not to total per pupil funding. Because we reach this conclusion from the

---

**6.** Plaintiffs and their amici also contend that the Act's revised finance formula now "cancels out" the variable of "statewide base per pupil funding," thereby rendering the base meaningless. *See* Response Brief at 13–14; Brief for Department of Business Officials of the Colorado Ass'n of School Executives as Amicus Curiae Supporting Respondents at 17 ("The General Assembly could state any amount in [the Act] for the Base—'$2', '$20,000', or even '2,000 Unicorns'—and the result would be the same."). This argument fails for the same reason. Whether or not the base possesses algebraic significance within the funding formula is immaterial. What matters is whether the resultant funding levels have actually dropped below the required base.

amendment's plain language, we need not resort to examining secondary sources to discern the voters' intent. *See Colo. Ethics Watch,* ¶ 20, 269 P.3d at 1254.

## V. Conclusion

¶ 27 Plaintiffs allege that the State has improperly reduced statewide base per pupil funding in violation of Amendment 23. In so doing, they confuse "base" with "total." Interpreting the term "statewide base per pupil funding" according to its plain and statutorily defined meaning, we hold that the negative factor has not reduced the base below its constitutional minimum and thus does not violate Amendment 23. Therefore, Plaintiffs have failed to state a claim for relief. Accordingly, we make our rule absolute, and we remand this case to the trial court with instructions to dismiss Plaintiffs' complaint.

JUSTICE MÁRQUEZ dissents, and JUSTICE HOOD and JUSTICE GABRIEL join in the dissent.

JUSTICE MÁRQUEZ, dissenting.

¶ 28 Plaintiffs allege that the "negative factor" created by the legislature in section 22–54–104(5)(g), C.R.S. (2010), circumvents the will of the Colorado electorate as expressed in Amendment 23 by effectively nullifying the Amendment's required increases to statewide base per pupil funding under the school finance formula. In concluding that the plain language of Amendment 23 allows the General Assembly's workaround, the majority ignores this claim. Although this case raises broad fiscal and policy issues of significant public importance, the narrow legal question before us is whether Plaintiffs have pleaded sufficient facts to survive a motion to dismiss. Because they have, I would discharge the rule to show cause. Therefore, I respectfully dissent.

¶ 29 Amendment 23 requires annual increases in "statewide base per pupil funding, as defined by the Public School Finance Act of 1994 ... on the effective date of this section." Colo. Const. art. IX, § 17(1). As the majority explains, although the Public School Finance Act ("the Act") does not actually define the term "statewide base per pupil funding," it establishes a formula to calculate education funding for school districts, and the "statewide base per pupil funding" is a component of that formula. Maj. op. ¶¶ 7–8, 20 & n.5. Everyone agrees that the plain language of Amendment 23 requires annual increases to the "statewide base per pupil funding" component of the formula. Everyone also agrees that the General Assembly has, in fact, increased the numerical value of base per pupil funding every year since the passage of Amendment 23. *See* § 22–54–104(5)(a)(VIII)–(XXII), C.R.S. (2015). The majority ends the analysis there, however, concluding that Amendment 23 has not been violated because the General Assembly has continued to increase the statewide base per pupil funding amount in the formula. Yet by focusing on the base component in isolation, the majority disregards the Plaintiffs' core claim: that the negative factor operates to eliminate those increases and now renders the base per pupil funding component of the formula ultimately irrelevant.

¶ 30 Under the school finance formula that existed "on the effective date" of Amendment 23, an increase to the "statewide base per pupil funding" necessarily generated an increase in a district's total per pupil funding. In other words, Colorado voters understood that, under the formula then in effect, increasing statewide base per pupil funding per Amendment 23 would yield an increase in total per pupil funding. The Blue Book[1] confirmed this understanding of the operation of Amendment 23: It described the initiative to Colorado voters as a proposed constitutional amendment that would "increase[ ]

---

1. The Legislative Council of the Colorado General Assembly publishes and distributes to the public an analysis of statewide ballot proposals informally known as the "Blue Book." Contrary to the majority's suggestion, *see* maj. op. ¶¶ 19, 26, we have routinely relied on Blue Book descriptions and analyses in interpreting voter-initiated measures and referenda—even absent a determination

that the plain language of the measure is ambiguous. *See, e.g., Dallman v. Ritter,* 225 P.3d 610, 623 & n. 16, 626 & n. 25 (Colo.2010) (relying on the Blue Book to interpret voter-initiated Amendment 54); *Washington Cnty. Bd. of Equalization v. Petron Dev. Co.,* 109 P.3d 146, 151 (Colo.2005) (relying on the Blue Book to interpret state constitutional amendment adopted by referendum).

per pupil funding for public schools" and provided a mathematical example demonstrating that the required annual increases to base per pupil funding would drive increases in total per pupil funding under the then-existing school finance formula referenced in the Amendment. Legislative Council of the Colo. Gen. Assembly, *An Analysis of the 2000 Statewide Ballot Proposals* 9–10 (Research Publ'n No. 475–0, 2000) (hereinafter "*Blue Book*").[2]

¶ 31 The Blue Book explained that, under Amendment 23, the state constitution would set minimum annual increases in funding, thus replacing legislative discretion to increase or decrease funding. *Id.* at 9. Following its passage, the Amendment operated as described in the Blue Book for several years. However, the General Assembly subsequently enacted the "negative factor" and fundamentally altered the school finance formula to calculate funding to conform to a legislatively predetermined spending cap. Hence, the legislature once again controls annual increases or decreases in school funding—just as it did before voters passed Amendment 23. In short, the funding that school districts actually receive now is no longer driven by the increases to the base under Amendment 23 in concert with the finance formula in effect at its enactment. Instead, the legislature chooses a spending cap and calculates a corresponding "negative factor" that is applied to reduce the funding that districts otherwise would receive under the formula. The negative factor operates specifically to ensure that total spending does not exceed the legislature's predetermined cap.

¶ 32 The issue, then, is how the negative factor impacts the increases to statewide base per pupil funding required under Amendment 23. Plaintiffs allege that the negative factor, in concert with the statutory cap under the altered formula, effectively eliminates the increases to statewide base per pupil funding under Amendment 23 and renders the base component of the formula irrelevant. In my view, Plaintiffs' Complaint

states a viable claim that the negative factor violates Amendment 23. Accordingly, I would discharge the rule and permit the Plaintiffs to prove their claims at trial.

## I. Background

¶ 33 I begin by briefly describing the circumstances that led to the voters' enactment of Amendment 23. I then examine the General Assembly's response to the fiscal exigencies of the last decade—the so-called "negative factor"—which has worked significant cuts to education funding.

### A. Amendment 23

¶ 34 Per pupil spending in Colorado was significantly below the national average in 2000. Br. of Colo. Educ. Ass'n at 5. As a result, teacher pay lagged behind the national average, and Colorado had higher student-to-teacher ratios than in other states. *Id.* at 5–6, 9. Thus, Colorado educators were required to stretch limited resources further than their peers in other parts of the country.

¶ 35 In 2000, the Colorado Education Network succeeded in placing on the ballot an amendment to the Colorado Constitution that would "increase[ ] per pupil funding for public schools." *Blue Book* at 9. The Blue Book explained that, "[u]nder [Amendment 23], the state constitution sets a minimum increase in funding"—in contrast to the discretion the legislature then had to determine any increase or decrease in funding. *Id.* In describing the principal arguments in favor of the proposed amendment, the Blue Book explained that Amendment 23 would reverse the "erosion" of funding to public schools and the negative effects such erosion had had on per pupil funding, teacher salaries, and class sizes. *Id.* at 11. In addition, by earmarking a portion of state revenue for public education, Amendment 23 would ensure that funding for public schools would not fall farther behind due to other constitutional

---

2. The Blue Book explained that, assuming inflation remained at 3.7% over the ten years following enactment of the Amendment, base per pupil funding would increase from $4,002 to $6,335—

and that, under the proposed amendment, average (total) per pupil funding would increase from $5,175 to $8,192. *Blue Book* at 10.

spending limits placed on the legislature. *Id.* at 12.

¶ 36 Amendment 23 received 53% of the vote in the 2000 general election. *See* Colo. Sec'y of State, *2000 General Election Results, available at* http://www.sos.state.co.us/pubs/elections/Results/2000/2000General ElectionResults.pdf. Colorado voters thereby added to the constitution article IX, section 17, which states:

> In state *fiscal year 2001–2002 through state fiscal year 2010–2011, the statewide base per pupil funding, as defined by the Public School Finance Act of 1994,* article 54 of title 22, Colorado Revised Statutes *on the effective date of this section,* for public education from preschool through the twelfth grade and total state funding for all categorical programs *shall grow annually at least by the rate of inflation plus an additional one percentage point. In state fiscal year 2011–2012, and each fiscal year thereafter, the statewide base per pupil funding* for public education from preschool through the twelfth grade and total state funding for all categorical programs *shall grow annually at a rate set by the general assembly that is at least equal to the rate of inflation.*

(Emphases added.)

¶ 37 It is undisputed that the plain language of Amendment 23 requires annual increases to the "statewide base per pupil funding" component of the school finance formula in the Public School Finance Act of 1994 as that term was used in the Act "on the effective date" of Amendment 23. As explained by the majority, base per pupil funding is a component of the school finance formula in the Act; the base component is uniform for all school districts. Maj. op. ¶ 7. Base funding is then adjusted under the formula to account for various district-specific factors such as personnel costs, cost of living, non-personnel costs, and size. These factors appear as multipliers to determine an individual district's per pupil funding. *See id.* Following Amendment 23's approval, the General Assembly has increased the statewide base per pupil funding amount by the rate of inflation plus one percentage point for budget years 2001–2002 to 2010–2011, and by

at least the rate of inflation thereafter. § 22–54–104(5)(a)(XIII)–(XXII).

¶ 38 It is also undisputed that, under the statutory formula in effect when the voters approved Amendment 23, an increase in base per pupil funding generated an increase to a district's total per pupil funding, assuming that a district's factors remained otherwise constant. As the majority acknowledges, until the General Assembly enacted the negative factor, the required annual increases to statewide base per pupil funding resulted in corresponding increases to total funding. Maj. op. ¶ 9.

## B. The Negative Factor

¶ 39 Colorado later faced severe budgetary constraints as a result of the financial crisis of 2007–2008 and the recession that followed. As described by the majority, the General Assembly determined in 2010 that "stabilization of the state budget require[d] a reduction in the amount of the annual appropriation to fund the state's share of total program funding." Maj. op. ¶ 10 (quoting § 22–54–104(5)(g)(I), C.R.S. (2010)). In short, the legislature sought to cut education funding. *See id.*

¶ 40 Legislators did not make these cuts lightly. One of the bill's sponsors acknowledged that they were "very painful" but were "necessary given the economic times." Second Reading of H.B. 10–1369 before the House, 77th Gen. Assemb., 2d Sess. (Mar. 19, 2010) (statement of Rep. Scanlan). Similarly, Senator Hudak explained:

> This is a terrible circumstance for us to be in. And it's because the economy is so bad that we at this point don't appear to have any choice. . . . I just wanted to explain to you why I, somebody who was part of the group that put Amendment 23 on the ballot, could even consider voting in favor of the bill.

Second Reading of H.B. 10–1369 before the Senate, 77th Gen. Assemb., 2d Sess. (Mar. 31, 2010) (statement of Sen. Hudak). The legislature nevertheless proceeded with these cuts by enacting the stabilization factor in paragraph (g) of section 22–54–104(5). Ch. 246, sec. 3, § 22–54–104(5)(g)(I)–(II), 2010

Colo. Sess. Laws 1095, 1095–97. The General Assembly later renamed the stabilization factor the "negative factor" and extended its application to future budget years. Ch. 305, sec. 3, 4, § 22–54–104(5)(g)(I)–(III), 2011 Colo. Sess. Laws 1463, 1464–66.

¶ 41 In enacting this legislation, the legislature fundamentally altered the school finance formula in the Act. As described by the majority, the legislature now determines, at its discretion, a cap on total funding. Maj. op. ¶¶ 11, 14 n.4. This cap is subtracted from the initial statewide total (i.e., the total funding amount that would be generated under the original school finance formula). The difference is divided by the initial statewide total to derive a reduction percentage called the "negative factor." *Id.* at ¶11; § 22–54–104(5)(g)(II)(A). The "negative factor" is then applied to reduce by a uniform percentage amount the funding that each school district otherwise would receive under the formula. Maj. op. ¶ 11; § 22–54–104(5)(g)(II)(B). Put differently, the *General Assembly* now decides what total spending will be each year and then reverse-calculates a negative factor to reduce the funding amount that the formula would otherwise generate to achieve the legislature's desired result.

¶ 42 As the majority necessarily recognizes, the negative factor "operates to reduce education funding across all Colorado school districts." Maj. op. ¶ 1. These funding reductions led Plaintiffs to file this lawsuit challenging the constitutionality of the negative factor. Compl. ¶ 4. Specifically, Plaintiffs' Complaint alleges that the funding cap and negative factor in section 22–54–104(5)(g) negate the will of the electorate by rendering Amendment 23's required increases to the base component in the formula essentially meaningless. *Id.* at ¶¶36–39. Expressed mathematically, Plaintiffs assert that base per pupil funding is now used both as a numerator and a denominator in the formula, thus canceling out the effect of any increases to base per pupil funding. *See* Appendix A.[3] According to Plaintiffs, by reducing the total per pupil funding that districts otherwise

would receive under the formula, the negative factor operates to nullify the annual increases made to the base component, thus violating Amendment 23. Compl. ¶¶ 38, 44.

## II.  Analysis

### A.  Standard of Review and Principles of Constitutional Construction

¶ 43 A motion to dismiss under C.R.C.P. 12(b)(5) for failure to state a claim tests the formal sufficiency of a plaintiff's complaint. *Qwest Corp. v. Colo. Div. of Prop. Taxation,* 2013 CO 39, ¶ 12, 304 P.3d 217, 221. Such motions are disfavored and should not be granted if relief is available under any theory of law. *Colo. Ethics Watch v. Senate Majority Fund, LLC,* 2012 CO 12, ¶ 16, 269 P.3d 1248, 1253. In reviewing a trial court's ruling on a C.R.C.P. 12(b)(5) motion, we accept the material factual allegations in the complaint as true and view them in the light most favorable to the non-moving party. *Id.*

¶ 44 Although we avoid constructions of constitutional amendments that would "hinder basic government functions or cripple the government's ability to provide services," *Barber v. Ritter,* 196 P.3d 238, 248 (Colo. 2008), we have also made clear that "courts should not engage in a narrow or technical construction of [an] amendment if doing so would contravene the intent of the electorate," *Davidson v. Sandstrom,* 83 P.3d 648, 654 (Colo.2004). Rather, courts must give words their ordinary and popular meaning to ascertain what the voters believed the amendment to mean when they adopted it. *Id.* Ultimately, our duty in construing a constitutional amendment is to give effect to the intent of the electorate in enacting the amendment. *See Lobato v. State,* 218 P.3d 358, 375 (Colo.2009); *Washington Cnty. Bd. of Equalization v. Petron Dev. Co.,* 109 P.3d 146, 150 (Colo.2005).

### B.  Application

¶ 45 Plaintiffs' complaint meets the C.R.C.P. 12(b)(5) standard. Because the trial court properly concluded that Plaintiffs have alleged sufficient facts to state a claim

---

**3.** At oral argument before this court, counsel for the State expressed no disagreement with Plain-tiffs' and amici's algebraic expression of the negative factor's impact on base per pupil funding.

that the negative factor violates Amendment 23, I would discharge the rule to show cause.

¶ 46 The plain language of Amendment 23 requires annual increases to the "statewide base per pupil funding" component of the school finance formula. And it is undisputed that the General Assembly has, in fact, increased that dollar figure each year since the passage of Amendment 23. According to Plaintiffs, however, what has changed is that the negative factor, which is applied to reduce the end product generated by the statutory formula, effectively wipes out those increases to statewide base per pupil funding. By focusing on the term "statewide base per pupil funding" in isolation, the majority ignores the Plaintiffs' core allegation.

¶ 47 As the majority correctly observes, we presume that the voters are aware of existing law when they enact a constitutional amendment. *See* maj. op. ¶ 19 (citing *Common Sense Alliance v. Davidson*, 995 P.2d 748, 754 (Colo.2000)); *see also Bickel v. City of Boulder*, 885 P.2d 215, 229 (Colo.1994). As described above, under the formula in effect when voters passed Amendment 23, increases to statewide base per pupil funding necessarily yielded increases to a district's total per pupil funding, assuming the district's factors otherwise remained constant. The Blue Book informed voters that Amendment 23 would "increase[ ] per pupil funding for public schools" under the school finance formula then in effect and even provided a mathematical example illustrating how increases to statewide base per pupil funding under that formula yielded increases to average (total) per pupil funding for school districts. *Blue Book* at 9–10.

¶ 48 Crucially, the formula that existed on the effective date of Amendment 23 contained nothing to counteract the effect of increases to base per pupil funding. That is, nothing in the law when Amendment 23 was enacted suggested to voters that increases to statewide base per pupil funding could be

nullified by application of something like a negative factor.

¶ 49 Yet, according to Plaintiffs' Complaint, the negative factor does exactly that by rendering increases to base per pupil funding meaningless. Compl. ¶ 38. As demonstrated in Appendix A, the negative factor actually cancels out base per pupil funding in the formula. Voters surely did not intend the annual increases to statewide base per pupil funding to be pointless—yet according to Plaintiffs' allegations, the negative factor renders them so. The majority's view that nominal increases in base per pupil funding are all that is necessary to satisfy Amendment 23 ignores the Plaintiffs' core claim. Maj. op. ¶¶ 1, 6, 20; *cf. Davidson*, 83 P.3d at 654 ("Courts should not engage in a narrow or technical construction of [an] amendment if doing so would contravene the intent of the electorate.").[4] Indeed, under the majority's view, the legislature can eliminate the school finance formula entirely so long as each district receives the statewide base per pupil funding amount. Maj. op. ¶ 24 & n.6. Such a view cannot possibly comport with the voters' understanding of Amendment 23.

¶ 50 Accepting the allegations in Plaintiffs' Complaint as true and viewing them in the light most favorable to the non-moving party, Plaintiffs have alleged sufficient facts to state a claim upon which relief may be granted. *Colo. Ethics Watch*, ¶ 16, 269 P.3d at 1253. Accordingly, I would discharge the rule to show cause and allow Plaintiffs to prove their claims at trial.

### III. Conclusion

¶ 51 Although the State faced extraordinarily difficult fiscal choices during the recent recession, Plaintiffs contend that enacting cuts to education funding that circumvent a constitutional amendment was not one of the legislature's options. They have pleaded sufficient facts to support a claim that the

4. The State's argument that the negative factor only decreases funding attributable to a district's enrollment factors is wholly unpersuasive. The negative factor does not lower any particular term in the formula, but rather applies to reduce a district's total funding by a blanket percentage. § 22-54-104(5)(g). Moreover, there would be no need for a provision ensuring that a district's total program does not fall below base per pupil funding, *see* § 22-54-104(5)(g)(III), if the negative factor drew exclusively from "factors funding." Indeed, as demonstrated in Appendix A, the magnitude of the negative factor depends on the level of base per pupil funding.

negative factor violates Amendment 23. Accordingly, I would discharge the rule to show cause. I respectfully dissent.

I am authorized to state that Justice HOOD and Justice GABRIEL join in this dissent.

## APPENDIX A

This appendix, derived from the briefing and submissions from Plaintiffs and amici, describes the calculation of a school district's state-provided funding pursuant to section 22–54–104, C.R.S. (2014). It shows that the "negative factor" effectively eliminates base

per pupil funding from the Public School Finance Act formula.

\* \* \*.

Section 22–54–104 sets forth the formula for calculating a school district's "total program," which is the annual financial base of support for public education in that district. § 22–54–104(1)(a). In general, each district has discretion as to how it will allocate its total program. *Id.*

For the 2009–2010 budget year and all years thereafter, a district's total program is initially calculated as follows (provided that the total program is not lower than a statutory floor):

$$
\begin{aligned}
\text{district total program} \\
= \text{district per pupil funding} \\
\times \left( \begin{array}{c} \text{district funded pupil count} - \text{district online pupil enrollment} \\ - \text{district ASCENT program pupil enrollment} \end{array} \right) \\
+ \text{district at-risk funding} + \text{district online funding} \\
+ \text{district ASCENT program funding}
\end{aligned}
$$

§ 22–54–104(2)(a)(IX). Because online funding and ASCENT funding do not affect the analysis here, those terms can be removed from the formula:

$$
\begin{aligned}
\text{district total program} \\
= \text{district per pupil funding} \times \text{district funded pupil count} \\
+ \text{district at-risk funding}
\end{aligned}
$$

Each of the terms on the right-hand side of the formula can be broken down further, as described below.

First,

$$
\begin{aligned}
\text{district per pupil funding} \\
= \text{statewide base per pupil funding} \times (\text{district personnel costs factor} \\
\times \text{district cost of living factor} + \text{statewide base per pupil funding} \\
\times \text{district nonpersonnel costs factor}) \times \text{district size factor}
\end{aligned}
$$

*See* § 22–54–104(3). The terms to the right of statewide base per pupil funding ("BPPF") together represent the district's enrollment factors ("EF"). Using this shorthand, the equation becomes:

$$
\text{district per pupil funding} = \text{BPPF} \times \text{EF}
$$

Second, district funded pupil count is typically the district's pupil enrollment for the applicable budget year, plus certain special

types of enrollment not relevant here (online pupil enrollment, ASCENT program enrollment, and preschool and supplemental kindergarten enrollment). § 22–54–103(7)(e)(I).

Third,

$$\text{district at-risk funding} = \text{district per pupil funding} \times 12\% \times \text{district at-risk pupils}$$

§ 22–54–104(4)(a)(I).[5] Substituting for district per pupil funding, as described above, district at-risk funding can also be expressed as follows:

$$\text{district at-risk funding} = \text{BPPF} \times \text{EF} \times 12\% \times \text{district at-risk pupils}$$

Inserting these three expansions, the total program formula becomes:

district total program

$$= \text{BPPF} \times \text{EF} \times \text{district funded pupil count} + \text{BPPF} \times \text{EF} \times 12\% \times \text{district at-risk pupils}$$

Pulling BPPF and EF out of the two added terms on the right side of the equation yields:

district total program

$$= \text{BPPF} \times \text{EF} \times (\text{district funded pupil count} + 12\% \times \text{district at-risk pupils})$$

Finally, if one treats the enrollment factors multiplied by pupil counts as the district's weighted enrollment ("WE"), the formula is simply:

$$\text{district total program} = \text{BPPF} \times \text{WE}$$

Thus, one arrives at a simplified form of the formula that produces a district's total program before the negative factor has been applied.

\* \* \*

Paragraph (g) requires the Department of Education to reduce total program funding through the application of a negative factor. § 22–54–104(5)(g)(I). For each budget year, the General Assembly establishes a budgetary cap—the sum of the total program funding for all districts—which is met by reducing each district's total program by an amount determined by the negative factor. § 2–54–104(5)(g)(I)(A)–(E). The statute defines a district's reduction amount as follows:

$$\text{district reduction amount} = \text{district total program} \times \text{negative factor}$$

§ 22–54–104(5)(g)(II)(B). It further defines the negative factor as:

**5.** If a district's percentage of at-risk pupils is higher than the statewide average and its funded pupil count is greater than 459, the statute amplifies the number of at-risk pupils in that district over the number it would have if its percentage of at-risk pupils were the same as the statewide average. *See* § 22–54–104(4)(b)(I). The present analysis assumes that the district does not have an above–average percentage of at-risk pupils.

$$\text{negative factor} = \frac{\text{statewide reduction amount}}{\text{statewide total program}}$$

§ 22–54–104(5)(g)(II)(A). Inserting this expansion into the previous equation, each district's total program is reduced by the following amount:

$$\text{district reduction amount} = \text{district total program} \times \frac{\text{statewide reduction amount}}{\text{statewide total program}}$$

Subtracting the district reduction amount from the district total program derived above gives the following:

$$\text{reduced district total program} = \text{district total program} - \text{district reduction amount}$$

$$\text{reduced district total program} = \text{district total program} - \left(\text{district total program} \times \frac{\text{statewide reduction amount}}{\text{statewide total program}}\right)$$

Realizing that the statewide reduction amount is the initial statewide total program minus the budgetary cap,

$$\text{reduced district total program} = \text{district total program} - \left(\text{district total program} \times \left[\frac{\text{statewide total program} - \text{budgetary cap}}{\text{statewide total program}}\right]\right)$$

simplifying within the brackets,

$$\text{reduced district total program} = \text{district total program} - \left(\text{district total program} \times \left[1 - \frac{\text{budgetary cap}}{\text{statewide total program}}\right]\right)$$

applying the district total program inside the parentheses,

$$\text{reduced district total program} = \text{district total program} - \left(\text{district total program} - \left[\frac{\text{district total program} \times \text{budgetary cap}}{\text{statewide total program}}\right]\right)$$

and canceling out the first two instances of district total program, one ends up with:

$$\text{reduced district total program} = \frac{\text{district total program} \times \text{budgetary cap}}{\text{statewide total program}}$$

As noted above, a district's total program equals base per pupil funding times the district's weighted enrollment, and statewide total program is the sum of all districts' total programs, § 22–54–104(5)(g)(VII)(A). Thus:

$$\text{reduced district total program} = \frac{\text{BPPF} \times \text{WE} \times \text{budgetary cap}}{(\text{BPPF} \times \text{WE}_1) + (\text{BPPF} \times \text{WE}_2) + (\text{BPPF} \times \text{WE}_3)\dots}$$

Pulling base per pupil funding out of the denominator and designating the sum of all districts' weighted enrollments as statewide weighted enrollment ("SWE"),

$$\text{reduced district total program} = \frac{\text{BPPF} \times \text{WE} \times \text{budgetary cap}}{\text{BPPF} \times \text{SWE}}$$

one can see that base per pupil funding cancels out of the formula, leaving the district's final, reduced total program as its weighted enrollment divided by statewide weighted enrollment, multiplied by the budgetary cap:

$$\text{reduced district total program} = \frac{\cancel{\text{BPPF}} \times \text{WE} \times \text{budgetary cap}}{\cancel{\text{BPPF}} \times \text{SWE}}$$

$$\text{reduced district total program} = \frac{\text{WE}}{\text{SWE}} \times \text{budgetary cap}$$

This result demonstrates that a district's total program, as reduced using the negative factor, does not depend on base per pupil funding.